**TONOPAH MINING CO. OF NEVADA v. COMMISSIONER OF INTERNAL REVENUE.**

No. 7812.

Circuit Court of Appeals, Third Circuit.

Argued Nov. 5, 1941.

Decided March 17, 1942.

240

George E. H. Goodner, of Washington, D. C. (Helen Goodner, of Washington, D. C., on the brief), for petitioner.

Gerald L. Wallace, Sp. Asst. to Atty. Gen. (Samuel O. Clark, Jr., Asst. Atty.

Gen., and J. Louis Monarch and Sherley Ewing, Sp. Assts. to Atty. Gen., on the brief), for respondent.

Before CLARK and JONES, Circuit Judges, and GANEY, District Judge.

CLARK, Circuit Judge.

The petitioner is and has been since 1901 the owner of a gold and silver mine in Nevada. Petitioner operated the mine until it closed temporarily in February, 1930. The mine was reopened in October of that year under a plan whereby certain areas were leased to small groups of miners on a royalty basis. Petitioner had one other source of income. Prior to its leasing of the mine, it was able to recover only about 95% of the metals from the ore. The balance of 5% went into the tailings dump on petitioner's property. Methods of recovery then improved and it became feasible and profitable to recover practically all of the 5% which remained in the tailings dump. This, too, petitioner leased on a royalty basis.

The Supreme Court has conceded the power to tax the gross income received from the exploitation of mineral deposits without allowing a deduction for depletion.[1] Nevertheless Congress generously permitted such a deduction. Prior to the Revenue Act of 1932, the taxpayer had a choice of methods which might be used for determining the depletion allowance.[2] It could select the cost or fair market value as of March 1, 1913 or the discovery value.[3] The petitioner took depletion allowances every year until by 1923 the total deductions equalled both the fair market value and petitioner's actual cost of the mines. Then in 1932 Congress abandoned the discovery value method and adopted for the first time percentage depletion.[4] This Act required a taxpayer to elect in his 1933 return whether he desired to have his allowance determined upon the percentage or cost basis for future years. The same opportunity to elect methods was renewed in the 1934 Act.[5] Nevertheless, pe-

---

[1] Stanton v. Baltic Mining Co., 240 U.S. 103, 36 S.Ct. 278, 60 L.Ed. 546; Riley Investment Co. v. Com'r, 311 U. S. 55, 61 S.Ct. 95, 85 L.Ed. 36.

[2] 26 U.S.C.A.Int.Rev.Acts, pages 166, 167, and 185, 187.

[3] Cf. Determination of Taxable Net Income From Mineral Property, 43 Yale Law Journal 466; Income Taxation—

Who May Take An Allowance For Depletion, 23 Virginia Law Review 837.

[4] 26 U.S.C.A.Int.Rev.Acts, page 520.

[5] "Percentage depletion for coal and metal mines and sulphur. The allowance for depletion under section 23(m) shall be, in the case of coal mines, 5 per centum, in the case of metal mines, 15 per centum, and, in the case of sulphur

titioner in its 1934 and 1935 returns made no such election, although it received royalties and returned income for those years. In its 1936 and 1937 returns, however, petitioner did attempt to elect to have the percentage depletion allowance applied to its mining property. Both of these elections were disallowed by the Commissioner of Internal Revenue on the ground that the petitioner failed to make an election in its 1934 return. The determination of a deficiency was appealed to the Board of Tax Appeals. After a hearing before the Board, but prior to the Board's decision, petitioner filed a motion to reopen the proceeding. It desired to introduce evidence upon a matter heretofore unconsidered— an asserted right to a percentage depletion upon the royalties received from mill tailings in 1936 and 1937. The Board denied the motion and rendered its opinion without reference to it. The Board affirmed the Commissioner's ruling that because the 1934 income tax return failed to state an election to have a depletion allowance computed on a percentage basis, the deductions might not be claimed in 1936 and 1937. Petitioner has appealed from the denial of its motion to reopen and from the Board's decision.

 Since taxpayer's motion to reopen might properly have been denied if the deficiency was validly assessed, our first consideration must be the petitioner's right to make a new election in its 1936 return.[6] It makes two arguments in support thereof. Its subsidiary claim is based on the particular facts here involved. It asserts that an election is unnecessary because the only possible basis on which it could take a depletion allowance was the percentage basis. Since there was only one method by which a depletion deduction would have been available, it really had no choice, it argues, and therefore was not required to make the statement called for by the statute. As authority for this proposition petitioner cites our decision in Pittston-Duryea Coal Co. v. Commissioner.[7] Unfortunately for it, however, taxpayer comes within the exact difference in facts adverted to in the companion case of Kehoe-Berge Coal Co. v. Commissioner.[8] Petitioner reported a net income for 1934 and therefore must make an election even though its cost basis had been exhausted.

---

mines or deposits, 23 per centum, of the gross income from the property during the taxable year, excluding from such gross income an amount equal to any rents or royalties paid or incurred by the taxpayer in respect of the property. Such allowance shall not exceed 50 per centum of the net income of the taxpayer (computed without allowance for depletion) from the property. *A taxpayer making his first return under this title in respect of a property shall state whether he elects to have the depletion allowance for such property for the taxable year for which the return is made computed with or without regard to percentage depletion, and the depletion allowance in respect of such property for such year shall be computed according to the election thus made. If the taxpayer fails to make such statement in the return, the depletion allowance for such property for such year shall be computed without reference to percentage depletion. The method, determined as above, of computing the depletion allowance shall be applied in the case of the property for all taxable years in which it is in the hands of such taxpayer,* or of any other person if the basis of the property (for determining gain) in his hands is, under section 113, determined by reference to the basis in the hands of such taxpayer, either directly or through one or more substituted bases, as defined in that section." § 114 (b) (4), 26 U.S.C.A.Int.Rev.Acts, page 702 (italics ours).

6 Section 114(b) (4) of the 1934 Act was reenacted without change in the 1936 Act with the added provision: "The above right of election shall be subject to the qualification that this paragraph shall, *for the purpose of determining whether the method of computing the depletion allowance follows the property,* be considered a continuation of section 114(b) (4) of the Revenue Act of 1934, and as giving no new election in cases where such section would, if applied, give no new election." 26 U.S.C.A.Int.Rev. Acts, page 867 (italics ours)

Section 114(b) (4) was reenacted in the Revenue Act of 1938, the only change being to include in the last sentence a reference to the Revenue Act of 1936 as well as the 1934 Act. Similarly, Section 114(b) (4) of the Internal Revenue Code is identical, except that it includes in the last sentence a reference to the 1938 Act and in the third sentence changes "title" to "chapter". 26 U.S.C.A. Int.Rev.Code § 114(b) (4).

7 117 F.2d 436. The Second Circuit Court of Appeals has held contra, criticizing our decision. Mother Lode Coalition Mines Co. v. Com'r, 2 Cir., 125 F.2d 657.

8 117 F.2d 439.

Petitioner's argument overlooks one other point. In claiming that it had no real election in 1934, petitioner asserts that the only depletion allowance it could take in that year would be based upon the percentage method. This is quite true, but it must be remembered that Section 114(b) (4) of the Revenue Act of 1934 by its terms bound petitioner for all future years. If petitioner was contemplating additional capital expenditures in the immediate future, the percentage basis would not have been the most advantageous. Tax savings in the long run would have been greater in such circumstances if petitioner kept silent and used the cost method.

Petitioner's main contention is that the Act of 1936 gave it a new right of election. For the purposes of this argument, petitioner concedes that had the 1934 Act remained in effect, petitioner would have been bound by the election which it made or should have made in its first return thereunder. The fifth sentence of Section 114(b)(4) of the 1934 Act provides that the method so determined shall be applied "for all taxable years in which it [the property] is in the hands of such taxpayer, or of any other person." In an effort to avoid this language, the petitioner points out that Section 114(b)(4) of the 1934 and 1936 Acts are identical, as we indicated earlier in this opinion, except for the new sentence which is added at the end of the 1936 enactment. Petitioner stresses the phrase we italicized[9] ("for the purpose of determining whether the method of computing the depletion allowance follows the property"). The plain and obvious meaning of this phrase, petitioner argues, is that it is applicable only if there occurred a change in ownership of the property at some time after the method of determining the depletion allowance was fixed under the 1934 Act. Since there was no change in the ownership of petitioner's property, it says that the right to make an election as to the method of depletion set out in the 1936 law is not subject to the qualification in the last sentence thereof.

■ The problem, then, is the old one of interpreting the meaning of words used in statutes. Almost four centuries ago the Baron of the Exchequer declared that "the office of all the judges is always to make such construction as shall suppress the mischief, advance the remedy, and to suppress subtle inventions and evasion for continuance of the mischief, and pro privato commodo, and to add force and life to the cure and remedy, according to the true intent of the makers of the Act pro bono publico."[10] Both Bacon[11] and Blackstone[12] in different words have reiterated the theory. Plowden even went further, saying: "It is a good way, when you peruse a statute, to suppose that the lawmaker is present and that you have asked him the question you want to know touching the equity. Then you must give yourself such answer as you imagine he would have done, if he had been present. * * * And if the lawmaker would have followed the equity notwithstanding the words of the law. * * * You may safely do the like, for while you do no more than the lawmaker would have done, you do not act contrary to the law, but in conformity with it." Plowden's Rep. 465. This type of interpretation is now known as judicial legislation and has been rejected.[13] While we do not go to the extent advocated by Plowden it is clear that we are not bound to adopt any literal meaning. As one commentator has put it: "The obvious meaning is not the correct one unless it is sensible. * * * If a statute is susceptible of another interpretation—a contextual or implied meaning—which is derived from the whole text itself with or without the use

---

9 See footnote 6.

10 Heydon's Case, 1584, 3 Co. 7 b.

11 "Such Construction ought to be put upon a Statute as may best answer the Intention which the makers had in View; for qui haevet in Litera, haevet in Cortice."
Bacon's Abridgment (1759) 647.

12 "The most universal and effectual way of discovering the meaning of a law, when the words are dubious,* is by considering the reason and spirit of it; or the cause which moved the legislator to enact it."
1 Blackstone's Comm. 61.

* "The precise meaning of the * * * addition to this section [114(b) (4) of the 1934 Act] is not as clear as it might be." Paul and Mertens, Law of Income Taxation (Supp.1939) § 21.26, p. 1010.

13 Loyd, The Equity of a Statute, 58 University of Pennsylvania Law Review 76; De Sloovere, The Equity and Reason of a Statute, 21 Cornell Law Quarterly 591; Thorne, The Equity of a Statute and Haydon's Case, 31 Illinois Law Review 202; cf. Statutes—Contracts—Interpretation—Use of Preambles or Recitals, 25 Minnesota Law Review 924.

of extrinsic aids and if such contextual meaning is a fair one in that it accords with the ordinary use of language and with the object and purpose of the statute, it is clearly superior to any obvious or literal meaning which does not fulfill these demands." De Sloovere, Contextual Interpretation of Statutes, 5 Fordham Law Review 219, 220.[14]

When Congress adopted the percentage depletion basis in the 1932 Act, it required a taxpayer to elect in his 1933 return whether he desired to have his allowance determined upon the percentage or cost basis *for future years*. The election for future years was designed to prevent taxpayers from switching back and forth from one method to the other. The legislative history is cited and is clear:

"Section 114(b)(4). Percentage Depletion for Metal Mines and Sulphur.

"Under paragraph (b)(4) metal mines are granted a percentage depletion allowance of 15 per cent, and sulphur mines or deposits of 23 per cent of the gross income from the property during the taxable year. As in the case of oil and gas wells this allowance can not exceed 50 per cent of the net income of the taxpayer from the property. In respect to the taxable years 1932 and 1933 the taxpayer is privileged to have the greater of either (1) the percentage depletion allowance or (2) an allowance computed on the adjusted basis provided in section 113(b), 26 U.S.C.A. Int.

Rev.Acts, page 518 (usually cost or March 1, 1913, value, with adjustments). This privilege is the same for those two years as that accorded both under the existing law and the bill in the case of oil and gas wells for all years.

"In the return for the taxable year 1933, however, the taxpayer is required to state as to each property whether he elects to have the depletion allowance for such property for succeeding taxable years computed with or without reference to percentage depletion; this election must be as between either percentage depletion or depletion computed upon the adjusted basis. In the case of any property in respect of which a return is first made in a year subsequent to the taxable year 1933, the election indicated in the return for such year shall be binding as to all future years. If the taxpayer fails to make such election in the return in which it should be indicated, the depletion allowances for that and succeeding taxable years will be computed on the adjusted basis." Report of Senate Finance Comm., S.Rept.No.665, 75th Cong., 1st Sess., p. 30.

"The amendment requires that the taxpayer make in his 1933 return an election, binding for 1934 and subsequent years, whether he will have the depletion deduction as to each property computed with or without reference to percentage depletion, and the failure so to elect will preclude the use of the percentage definition." Report

---

[14] "The object of genuine interpretation is to discover the rule which the lawmaker intended to establish; to discover the intention with which the law-maker made the rule, or the sense which he attached to the words wherein the rule is expressed. Its object is to enable others to derive from the language used 'the same idea which the author intended to convey.' Employed for these purposes, interpretation is purely judicial in character." Pound, Spurious Interpretation, 7 Columbia Law Review 379, 381.

"It should always be permissible for courts to discover the legislative intention if possible. However, once it has been discovered, it should be relevant to the solution of the case only if consistent with the 'meaning,' which may reasonably be attached to the words used. In other cases the 'meaning' of the court is decisive. This will generally accord with the 'meaning' which would be attached to the words by ordinary persons, but in some cases a different result may be reached

because of considerations of equity or policy which, in the minds of the courts, are controlling." Nutting, The Ambiguity of Unambiguous Statutes, 24 Minnesota Law Review 509, 521.

See also Landis, A Note on Statutory Interpretation, 43 Harvard Law Review 886; Jones, Extrinsic Aids in the Federal Courts, 25 Iowa Law Review 737; De Sloovere, Extrinsic Aids in the Interpretation of Statutes, 88 University of Pennsylvania Law Review 527; Nutting, The Relevance of Legislative Intention Established by Extrinsic Evidence, 20 Boston University Law Review 601; Horack, In the Name of the Legislative Intention, 38 West Virginia Law Quarterly 119; Jones, The Plain Meaning Rule and Extrinsic Aids in the Interpretation of Federal Statutes, 25 Washington University Law Quarterly 2; De Sloovere, Textual Interpretation of Statutes, 11 New York University Law Quarterly Review 538.

of the Conference Comm. with regard to Amendment No. 54, H.Rept.No.1492, 72nd Cong., 1st Sess., p. 15.[15]

 This provision became effective on June 6, 1932 and it is therefore probable that many small companies were ignorant of their right to elect percentage depletion at the time when their 1933 returns were filed. Consequently, to avoid hardship to these companies it was decided to give them another chance to elect in 1934. The Revenue Act of that year permitted this new election, but again it was to be binding for all future years. As before, the purpose of making the election binding in the future was "to avoid administrative complexity".[16] The purpose of the clause, then, was to prevent a taxpayer from switching from one basis to another and to enable the Bureau of Internal Revenue to check the depletions taken as against the return of the previous year. When the Act of 1936 was passed, Congress kept the 1934 provision intact and added an additional sentence. With the preceding history of the provision in mind, it is apparent what Congress intended that sentence to accomplish. It intended to carry out its previous policy of making taxpayers abide by the basis of depletion allowance chosen on the first return.[17]

 Petitioner argues that such a result was not accomplished because the words "follows the property" were used in the sentence. A literal meaning of these words implies that the sentence is inapplicable unless there has been a change of ownership. But such a result would be absurd. It would allow those who retained ownership after 1934 to elect anew, while binding those who took as successors in interest. If any distinction were to be made between these two classes, it would be more sensible to deprive the continuous owner of the privilege of changing methods at will, than to bind a successor to a choice of the original owner. If we are to avoid this curious result, what meaning is to be attached to the words "follows the property"? The words have a contextual meaning. They connote a time relationship as well as suggesting a change of ownership. In this contextual meaning the sentence would read as if the words "through the years" came directly after "follows the property". Thus, "follows the property" is synonymous with "adheres to the property". Since the literal meaning leads to an absurd result, it must be rejected in favor of a contextual meaning which accords with the legislative intent. Under the 1936 Act, then, petitioner was not given a new election but was bound by the election made in 1934.

 As we stated at the outset, petitioner has also appealed from the Board's denial of a motion. By its motion petitioner tried to introduce evidence that it was entitled to a percentage depletion allowance in 1936 and 1937 on income from mill tailings. Since the petitioner did not elect to avail itself of the percentage basis with respect to this property when it filed its 1934 return, it may not do so in its 1936 and 1937 returns. The motion was therefore properly denied. Even if we had allowed the election, we would be constrained to uphold the Board's decision on the motion. The petitioner claims that it did not earlier assert its election with respect to the mill tailings because it had been a practice of the Treasury Department to refuse a deduction for depletion on tailings.[18] This practice, it alleges, was overruled by Kennedy Mining & Milling Co. v. Commissioner of Internal Revenue,[19] decided after the argument before the Board had been concluded. But there is

---

[15] "If petitioner's view were adopted, taxpayers with the benefit of hindsight could shift from one basis of depletion to another in light of developments subsequent to their original choice. It seems clear that Congress provided that the election must be made once and for all in the first return in order to avoid any such shifts." Riley Inv. Co. v. Commissioner, 311 U.S. 55, 59, 61 S.Ct. 95, 97, 85 L. Ed. 36.

[16] Report of the Ways and Means Comm., H.Rept. No. 704, 73d Cong., 2nd Sess., p. 29.

[17] "Probably, these additional words, added in the Code and the 1938 and 1936 Acts, were intended to negative any new right of election under those acts and to bind the taxpayer to the depletion election already made under the 1934 Act." Paul and Mertens, Law of Income Taxation (Supp.1939) § 21.26, p. 1010.

[18] See Atlas Milling Co. v. Jones, 10 Cir., 115 F.2d 61, noted in Should A Depletion Allowance Be Permitted In Income Tax Computation Where Tailings Are Involved, 13 Rocky Mountain Review 258.

[19] 43 B.T.A. 617, affirmed Com'r v. Kennedy Mining & Milling Co., 9 Cir., Feb. 4, 1942, 125 F.2d 399.

no evidence of what the practice of the Treasury had been in this respect. The Board's opinion merely states that the issue is "one of first impression."[20] The process by means of which the profitable reworking of mill tailings became possible had only recently been perfected. It may well be, therefore, that there had simply been no occasion to consider the legal issue at an earlier date. If so, the petitioner had the same opportunity as the Kennedy Mining Company to raise the issue in the original proceedings. The Board's action on either a motion to amend[21] or to reopen is discretionary.[22] Since we can find no abuse of discretion in denying the motion, the decision must be upheld.[23]

The decision of the Board of Tax Appeals is affirmed.

[20] 43 B.T.A. 617, 620.

[21] 26 Internal Revenue Code § 1111, 26 U.S.C.A.Int.Rev.Code § 1111; Rules of Practice of the Board of Tax Appeals, Rule 17, 26 U.S.C.A.Int.Rev.Code following section 5011.

[22] Bankers Pocohontas Coal Co. v. Commissioner, 287 U.S. 308, 53 S.Ct. 150, 77 L.Ed. 325; Com'r v. Sussman, 2 Cir., 102 F.2d 919, 922, 923; Scott v. Commissioner, 8 Cir., 117 F.2d 36.

[23] See Taxation-Board of Tax Appeals —New Trials and Rehearings, 2 George Washington Law Review 526.