**John FACTOR, Petitioner,**

v.

**COMMISSIONER OF INTERNAL REVENUE, Respondent.**

**No. 16326.**

United States Court of Appeals
Ninth Circuit.

June 20, 1960.

Rehearing Denied July 27, 1960.

Robert E. Sher, Washington, D. C., for petitioner; Isadore G. Alk, Washington, D. C., Jack B. Rubin, Chicago, Ill., of counsel.

Charles K. Rice, Asst. Atty. Gen., Lee A. Jackson, A. F. Prescott, Victor A. Alt-man, Attys., Dept. of Justice, Washington, D. C., for respondent

Before JERTBERG and MERRILL, Circuit Judges, and YANKWICH, District Judge.

YANKWICH, District Judge.

Before us is a petition filed October 22, 1958, to review [1] the decision of the Tax Court entered July 24, 1958, relating to federal income taxes for the taxable years 1935 and 1936.

On August 9, 1946, the Commissioner of Internal Revenue mailed to the taxpayer notice of deficiencies in the amount of $38,315.03 for the year 1935 and $134,-912.23 for the year 1936, with an added fraud penalty of fifty per cent for each year.

On November 4, 1946, i. e., within the ninety day period, the taxpayer filed a petition with the Tax Court for a redetermination of the deficiencies.[2] The specification of errors relates to five topics which the taxpayer has summed up in this manner:

(a) The Tax Court erred in holding that the corporate entity of Montray should be ignored and thereby imposed an improper burden of proof on taxpayer;

(b) The Tax Court erred in holding that the deposits in the Miss C. Pitts bank account with the Lake Shore Trust and Savings Bank, Chicago, Illinois, constituted income to the taxpayer;

(c) The Tax Court committed plain error in its treatment of the Consolidated Diana transaction;

(d) The Tax Court committed plain error in refusing to consider and in failing to give taxpayer credit for disbursements and advances made by him in connection with the Canadian and English operation; and

(e) The alleged concessions made by the taxpayer in the course of settlement

1. 1954 I.R.C., § 7482(a); 26 U.S.C., 1958 ed., § 7482(a).

2. 1934 Rev.Act, § 271, 48 Stat. 740, ch. 277, § 271, 26 U.S.C.A. Int.Rev.Acts, p. 743; 1936 Rev.Act, § 271, 49 Stat. 1721, ch. 690, § 271, 26 U.S.C.A. Int. Rev.Acts, p. 912.

negotiations were not admissible in evidence.

This is not the order in which the assignments are treated in the briefs. We have rearranged them for convenience of treatment and to avoid repetition. Because the transactions are rather involved, it is well at the outset to set forth certain facts stipulated or proved.

## I

### Facts Conceded or Found

An extended stipulation of facts was filed in the case on which many of the findings of fact of the Tax Court are based. From it we cull the following admitted facts:

The Petitioner, John Factor, to be referred to as "the taxpayer", is a resident alien, residing in Beverly Hills, California. His income tax returns for the years 1935 and 1936 were filed with the Collector of Internal Revenue for the Sixth California District.

On August 9, 1946, the Commissioner of Internal Revenue issued a Statutory Notice of Deficiency and Penalties setting forth the following proposed deficiencies in income taxes and penalties:

| Year | Deficiency | 50% Penalty |
|---|---|---|
| 1935 | $ 38,315.03 | $19,157.52 |
| 1936 | 134,912.23 | 67,456.12 |

The deficiencies and penalties were determined by the Commissioner by increasing the net income for each of the two taxable years as follows:

### Taxable Year Ended December 31, 1935
#### Adjustments to Net Income

| | | |
|---|---|---|
| Net income as disclosed by return .......... | | None |
| Unallowable deductions and additional income: | | |
| (a) Interest income .................$ | 1,161.05 | |
| (b) Montray Finance Corporation, | | |
| Ltd. disbursements .............. | 68,911.87 | |
| (c) Other income ................... | 44,383.19 | 114,456.11 |
| Total ........................................ | | $114,456.11 |
| Nontaxable income and additional deductions: | | |
| (d) Taxes ................................... | | 257.84 |
| Net income adjusted ............................. | | $114,198.27 |

### Taxable Year Ended December 31, 1936
#### Adjustments to Net Income

| | | |
|---|---|---|
| Net loss as disclosed by return ...................... | | $ 12,304.87 |
| Unallowable deductions and additional income: | | |
| (a) Montray Finance Corporation, | | |
| Ltd. disbursements ..............$263,135.19 | | |
| (b) Capital loss restored ............. | 10,304.87 | 273,440.06 |
| Total ........................................ | | $261,135.19 |
| Nontaxable income and additional deductions: | | |
| (c) Interest paid ....................$ | 720.53 | |
| (d) Taxes ........................ | 273.14 | 993.67 |
| Net income adjusted ............................. | | $260,141.52 |

---

For the year 1935, $68,911.87 of such increase in net income consists of payments made by Montray Finance Corporation, Ltd., of Montreal, Canada, to be

referred to as "Montray", determined by the Commissioner to be includible in taxpayer's income for that year.

For the year 1936, $263,135.19 of such increase in net income consists of payments made by Montray and remittances from Harry J. Goulding, determined by the Commissioner to be includible in taxpayer's taxable income for that year.

Montray was organized on July 4, 1935, under the laws of the Province of Quebec, Canada. At or about the time of its organization it agreed to purchase from certain directors of Kirkland Gold Rand, Ltd., to be referred to as "Kirkland",—which had mining property in the Kirkland Lake area of Ontario, Canada,—300,000 shares of the capital stock of that corporation for $12,535.00. On July 10, 1935, Montray agreed to purchase from Kirkland 100,000 shares of the capital stock of the latter corporation at 25¢ a share and received an option to purchase an additional 900,000 shares at prices ranging from 40¢ to 75¢ a share. On July 6, 1935, Montray granted to C. Rankin Nevens & Company, London, England, to be referred to as "Nevens", an option to purchase shares of Kirkland at a price of 90¢ a share in Canadian money. Nevens made sales of this stock in England at the price of five shillings a share, which at the then rate of exchange then amounted to approximately $1.25. After Gold Underwriters Canada, Limited, of Montreal, Canada, to be referred to as "Gold Underwriters", succeeded Montray the same option was extended to Nevens.

A number of checks issued by Montray during the period between July 11, 1935, and December 28, 1935, listed by the Commissioner, were determined by him to be income taxable to the taxpayer. Except where specifically admitted, the taxpayer denied that the checks or their proceeds were received by him or paid to him or for his benefit, or that they were taxable income.

In 1936, a corporation known as Diana Gold Mines, Ltd., which had been operating a gold mine in the Province of Manitoba, Canada, was in bankruptcy and its assets were for sale. As a result of nego-

tiations between A. C. Berman, acting for the taxpayer, and one Louis Leipsic of Winnipeg, Canada, it was agreed that $80,000 would be advanced to Leipsic; that Leipsic would acquire the assets of Diana Gold Mines, Ltd. from the trustee in bankruptcy and transfer such assets to a new corporation to be organized by him to be known as Consolidated Diana Gold Mines, Ltd., to be referred to as "Consolidated Diana". Of the amounts paid on the purchase in 1935 and 1936 we are concerned here with the $53,000 presumably paid by Montray in 1935.

Consolidated Diana was organized under the laws of the Province of Manitoba and 1,000,000 shares of its stock were issued in exchange for the assets of the bankrupt corporation; 800,000 of such shares, issued in the name of Canadian Mining & Industrial Securities, Ltd., were placed in escrow in October of 1936. These shares have never been disposed of. Of the remaining 200,000 shares, 174,125 shares were offered for sale and sold in England.

Shortly after Consolidated Diana was organized, an agreement was entered into between it and Carlisle Investment Trust, Ltd., to be referred as "Carlisle", for the acquisition by the latter of the treasury stock of Consolidated Diana at a price of 90¢ a share. Pursuant to such agreement, a total of 87,690 shares was sold by Carlisle and the sum of $79,163.50 was remitted therefor and deposited in the bank account of Consolidated Diana.

The Commissioner treated certain deposits in the account of Montray in the Bank of Toronto, Montreal, Canada, in the sum of $14,879.35 as advances from taxpayer. The Commissioner subtracted these deposits from the taxpayer's receipts from Montray for 1936, as determined by the Commissioner, in order to arrive at the taxpayer's taxable income from Montray for that year.

Gold Underwriters had been organized under the Company's Act of Canada on August 24, 1933. It had been an inactive company. During the early part of October, 1936, Montray's contracts and options with Kirkland were transferred to

Gold Underwriters. The first payment by Gold Underwriters for stock of Kirkland was made on October 7, 1936. The working arrangement between Montray and Nevens was continued with Gold Underwriters. As remittances were received from Nevens, Gold Underwriters deposited them in its bank account. Its affairs do not concern us. We refer to them merely because they are a part of the network of concerns through which the operations, out of which this controversy arose, were carried on.

During the period from December 13, 1934 to August 21, 1935, when the account was closed, the taxpayer had an account in the Lake Shore Trust & Savings Bank, Chicago, Illinois. This account was in the name of Miss Camille Pitts. The Commissioner determined that deposits in 1935, totalling $44,383.-19, were includible in the taxpayer's taxable income for that year.

The stipulation lists a large number of checks drawn on several accounts. Many of them do not concern us. For our purpose it is sufficient to state that, as to some of them, it is stated in the stipulation that

"none of these funds are paid to or for the benefit of"

the taxpayer. As to others is is stated that the taxpayer agreed that the sums were paid

"to him or for his benefit."

As to the interrelation between the corporations and the taxpayer, the Tax Court stated in its opinion:

"Petitioner practically admits, and we have found as a fact, that he was the sole owner of all three organizations; that they operated for him; and he owned all of the income of said organizations. The planned operation was that Montray and Gold Underwriters bought mining stock which they made available to Nevens

to be sold in England with the proceeds remitted back to either Montray or Gold Underwriters."

■ Here it is well to refer to the fact that the Tax Court found that the taxpayer and the agencies through which he acted failed to keep accurate books. The taxpayer kept no books at all. Montray kept no general ledger. Gold Underwriters' only records were its deposit slips, bank statements, cancelled checks and check stubs. The Tax Court found:

"Petitioner failed to maintain for any of the taxable years books of account or records sufficient to establish the amount of his gross income or deductions."

This finding is of special significance because when there is a failure to keep books all that the Tax Court can do is to

"make as close an approximation as it can, bearing heavily if it chooses upon the taxpayer whose inexactitude is of his own making." [3]

■ The failure here was deliberate and, as the Court found, fraudulent, and was not limited to Montray. It seems that not one of the organizations through which the taxpayer acted kept customary books or business records. Nevens, who headed the London organization and who was sent there by the taxpayer to set it up, stated that they did not have a bookkeeper, kept no general ledger, but kept only such books as

"were necessary to show the transactions. As far as balanced books are concerned, we never kept any."

This was the pattern established for Montray by Camille Pitts, who knew bookkeeping and who, for her own benefit, kept a record of the cash receipts and disbursements,—a kind of cash journal. Every so often she tallied the cash journal, check stubs, cancelled checks and bank statements. Montray had no other

3. Cohan v. C.I.R., 2 Cir., 1930, 39 F. 2d 540, 544. See, Greenfeld v. C.I.R., 4 Cir., 1947, 165 F.2d 318, 319–321; Roberts v. C.I.R., 9 Cir., 1948, 176 F. 2d 221, 226; Archer v. C.I.R., 5 Cir., 1955, 227 F.2d 270, 273–274; Union Stock Farms v. C.I.R., 9 Cir., 1959, 265 F.2d 712, 721–722.

records. Explaining their absence, she stated:

"A. Well, Mr. Factor never said to me, 'I am sending you up there to protect my interests.' He sent me up there to perform certain duties, and in performing them, I felt that that was part of my protecting his interests, to record the moneys that I had handled.

"Q. In other words, you were trying to keep track of the receipts and disbursements of Montray? A. That is right, yes. Without anyone ordering me to do it. *So that is why there wasn't any—not a journal, a ledger. I mean ordinarily, for keeping a complete set of books, you would have a journal and a ledger.*" (Emphasis added.)

Even William Bleet, a man sixty-five years old, who died before the trial, whose statement to the special agent of the Treasury Department was offered by the taxpayer and received in evidence for the purpose of showing certain expenditures by the taxpayer, relied entirely on his memory in testifying to the items. He spoke of hotel bills and tailor bills paid for the taxpayer, whom he had known since 1920. He called these transactions with him "personal" and, while he claimed that moneys received, as represented by various checks, were applied on debts owed to him by the taxpayer or were turned over to taxpayer's New York attorney, now deceased, offered no documentary proof.

The taxpayer himself, in the two taxable years, kept no books relating to the business of the agencies he used. He referred to the business of Montray as "my business", and as to the other concerns stated that he

"owned these concerns * * * and was responsible for them."

None of the Canadian associates kept books or filed returns, except as indicated. And, although Maurice Shulman, the taxpayer's Canadian attorney who organized some of the various Canadian entities, kept books of account showing large sums of money received and paid out for the taxpayer's benefit, he was not able to state definitely to whom certain sums were paid. Asked to explain why moneys were paid out on oral instructions of the taxpayer and without any written contemporaneous memorial, his answers were, "It is difficult to be specific" and "I don't question people when I refund their own funds".

To sustain the claim of the taxpayer before this Court that he should not be held responsible for the failure of these conduits to keep records, we would have to disregard realities. For, in his own words, he "was responsible for them".

## II

### Scope of Review and Burden of Proof

In view of the discussion to follow, certain accepted legal principles should be referred to. Subject to review by the Supreme Court on certiorari [4] we have exclusive and final jurisdiction to review the decisions of the Tax Court on appeal

"in the same manner and to the same extent as decisions of the district courts in civil actions tried without a jury." [5]

On such review, the findings of the Tax Court will not be disturbed unless clear error appears.[6] And the burden is on the taxpayer to show such clear error.[7]

---

4. 28 U.S.C. § 1254.

5. 26 U.S.C. § 7482(a). This section makes applicable to the Tax Court the rule applicable to appeals from district courts that findings shall not be set aside "unless clearly erroneous," Rule 52(a), Federal Rules of Civil Procedure, 28 U.S.C.

6. Cohn v. C.I.R., 9 Cir., 1955, 226 F.2d 22, 24; Wener v. C.I.R., 9 Cir., 1957,

242 F.2d 938, 944; Ferrando v. C.I.R., 9 Cir., 1957, 245 F.2d 582, 587–588; Kemper v. C.I.R., 8 Cir., 1959, 269 F.2d 184, 185–186.

7. 9 Mertens, Law of Federal Income Taxation, Zimet Revision, 1958, § 50 61. See, Higgins v. Smith, 1940, 308 U.S. 473, 477, 60 S.Ct. 355, 84 L.Ed. 406; Ward v. C.I.R., 9 Cir., 1955, 224 F.2d 547, 550; Golbert v. Renegotiation

Deductions being matters of legislative grace,[8] the burden is on the taxpayer to show that a claimed deduction was

"proximately related to the production of income." [9]

In applying these principles the determining factor is not the correctness of the reasoning of the Tax Court, but the correctness of its ultimate conclusion.[10] As stated very pithily in a unanimous opinion of the Supreme Court:

"Where the decision below is correct it must be affirmed by the appellate court though the lower tribunal gave a wrong reason for its action. Helvering v. Gowran, 302 U.S. 238, 245, 246, 58 S.Ct. 154, 157, 158, 82 L.Ed. 224." [11]

We consider the specifications of error in the light of these principles.

Board, 2 Cir., 1958, 254 F.2d 416, 417; Ullman v. C.I.R., 2 Cir., 1959, 264 F.2d 305, 308; O'Dwyer v. C.I.R., 4 Cir., 1959, 266 F.2d 575.

8. New Colonial Ice Co., Inc. v. Helvering, 1934, 292 U.S. 435, 440, 54 S.Ct. 788, 78 L.Ed. 1348; Gregory v. Helvering, 1934, 293 U.S. 465, 469–470, 55 S.Ct. 266, 79 L.Ed. 596; Deputy v. du Pont, 1940, 308 U.S. 488, 493, 60 S.Ct. 363, 84 L.Ed. 416; Moline Properties, Inc. v. C.I.R., 1943, 319 U.S. 436, 439, 63 S.Ct. 1132, 87 L.Ed. 1499; United States v. Olympic Radio & Television, Inc., 1955, 349 U.S. 232, 235, 75 S.Ct. 733, 92 L.Ed. 1024; A.B.C. Brewing Corporation v. C.I.R., 9 Cir., 1955, 224 F.2d 483, 490.

9. Lykes v. United States, 1952, 343 U.S. 118, 124, 72 S.Ct. 585, 589, 96 L.Ed. 791. Under the statutory power to make rules of practice and procedure (26 U.S.C. § 7453) the Tax Court has established the burden of proof before it in a rule which reads:
 "Rule 32. Burden of Proof.
 "The burden of proof shall be upon the petitioner, except as otherwise provided by statute, and except that in respect of any new matter pleaded in his answer, it shall be upon the respondent." Tax Court Rule 32, 26 U.S.C. See. Rules of Practice, Federal Tax

## III
### No Disregard of Entities

The taxpayer complains that the Tax Court disregarded Montray as an entity and charged him with the income received by it. While a taxpayer may choose the form in which he does business and a corporation and its stockholders are distinct entities, in tax matters the separate entity may be disregarded.[12] The courts, although maintaining the legal fiction of distinction between stockholder and corporation, may, in considering both income and deductions, reach the conclusion that a corporate entity *was the agent of a principal* in receiving income.[13] This is the conclusion which the Tax Court reached here, contained in the statement which reads:

" * * * We have found as a fact, that he was the sole owner of all three organizations; that they oper-

Regulations, 1960 U.S.Code Congressional and Administrative News, p. 2184.
See, Revell, Inc. v. Riddell, 9 Cir., 1959, 273 F.2d 649, 660. The applicable sections as to income and deductions for the taxable years under consideration are those contained in the Revenue Acts of 1934 and 1936. See, 1934 Rev.Act, § 21 ("Net income"); § 22(a) ("Gross income"); § 23 ("Deductions from gross income"), 26 U.S.C.A. Int.Rev.Acts, pages 669–675. The corresponding sections of the 1936 Act are identical, 26 U.S.C.A. Int.Rev.Acts, pages 825–831. Other specific sections will be referred to in the succeeding footnotes.

10. Helvering v. Gowran, 1937, 302 U.S. 238, 246, 58 S.Ct. 154, 82 L.Ed. 224.

11. J. E. Riley Investment Co. v. C.I.R., 1940, 311 U.S. 55, 59, 61 S.Ct. 95, 97, 85 L.Ed. 36.

12. New Colonial Ice Co., Inc. v. Helvering, supra Note 8, 292 U.S. at p. 442, 54 S.Ct. 788, 78 L.Ed. 1348. And see, National Carbide Corp. v. C.I.R., 1949, 336 U.S. 422, 428–430, 69 S.Ct. 726, 93 L. Ed. 779.

13. Interstate Transit Lines v. C.I.R., 1943, 319 U.S. 590, 594, 63 S.Ct. 1279, 87 L.Ed. 1607.

ated for him; and he owned all of the income of said organizations."

In brief, the Tax Court found that Montray's receipts were for the taxpayer's use and benefit. Indeed, in the stipulation the same phrase was used and repeatedly we have in it admissions that a certain check was received "for the taxpayer's use and benefit". So the problem before this Court, in this respect, is whether the conclusion thus reached is correct in view of the burden of the taxpayer.

 In assaying the facts the Commissioner may accept the taxpayer's explanation as to some of the items and reject it as to others, if uncorroborated by documentary evidence or the testimony of disinterested persons.[14] So doing the Commissioner (and the Tax Court) may disregard testimony which, although, uncontradicted, is nevertheless inherently improbable. The classic statement of this rule is contained in an old case in which Mr. Justice Field stated:

"Undoubtedly, as a general rule, positive testimony as to a particular fact, uncontradicted by any one, should control the decision of the court; but that rule admits of many exceptions. There may be such an inherent improbability in the statements of a witness as to induce the court or jury to disregard his evidence, *even in the absence of any direct conflicting testimony*. He may be contradicted by the facts he states as completely as by direct adverse testimony; and there may be so many omissions in his account of particular transactions, or of his own conduct, as to discredit his whole story. His manner, too, of testifying may give rise to doubts of his sincerity, and create the impression that he is giving a wrong coloring to material facts. *All these things may properly be considered in determining the weight which should be given to his statements, although there be no adverse verbal testimony adduced.*"[15] (Emphasis added.)

 The rule has been followed consistently in tax cases.[16] The Court of Appeals for the Fifth Circuit has epitomized it succinctly by stating:

" * * * the court is not bound to accept testimony at face value even when it is uncontroverted if it is improbable, unreasonable or questionable."[17]

 If the application of the rule in a particular case results in inequity the thing to remember is that

" 'general equitable considerations' do not control the question of what deductions are permissible."[18]

This is especially true where, through the failure of the taxpayer and his agents to keep adequate books, the Commissioner is compelled to approximate the income in what he deems the best method in the circumstances.[19]

 The counterweight to the argument that a heavy burden is thus cast upon the taxpayer is, as this Court stated in a recent case,

"the duty of the Commissioner to protect the revenue."[20]

14. Chesbro v. C.I.R., 2 Cir., 1955, 225 F.2d 674; Archer v. C.I.R., supra Note 3; Bodoglau v. C.I.R., 7 Cir., 1956, 230 F.2d 336, 340; Masters v. C.I.R., 3 Cir., 1957, 243 F.2d 335, 338; Baumgardner v. C.I.R., 9 Cir., 1957, 251 F.2d 311, 318–321; Anderson v. C.I.R., 5 Cir., 1957, 250 F.2d 242, 246–247.

15. Quock Ting v. United States, 1891, 140 U.S. 417, 420–421, 11 S.Ct. 733, 734, 35 L.Ed. 501.

16. Grace Bros., Inc. v. C.I.R., 9 Cir., 1949, 173 F.2d 170, 174; King v. C.I.R., 5 Cir., 1951, 189 F.2d 122, 124; Masters v. C.I.R., supra Note 14.

17. Archer v. C.I.R., supra Note 14, 227 F.2d at page 273; Clark v. C.I.R., 9 Cir., 1959, 266 F.2d 698, 708–709; Winters v. Dallman, 7 Cir., 1956, 238 F.2d 912, 914.

18. United States v. Olympic Radio & Television, Inc., supra Note 8, 349 U.S. at page 236, 75 S.Ct. at page 736, 99 L. Ed. 1024.

19. See cases cited in Note 3.

20. Revell, Inc. v. Riddell, supra Note 9, 273 F.2d at page 660.

▮ What the courts do in cases of this character is to tax profits to the person or entity to whom they go regardless of the facade which the taxpayer may have adopted to conceal the real beneficiary,—himself. Such a situation arose in one of the cases which came before this Court wherein, in order to conceal over-ceiling prices, a corporation had caused to be organized certain partnerships, the sole object of which was to syphon to them over-ceiling payments on meat sold by the company. The Tax Court having found that the partnerships had no business purpose, this Court said:

> "The partnerships were found to be without a business purpose, and not entered into in bona fides. Accordingly, they were properly disregarded, Commissioner v. Culbertson, 1949, 337 U.S. 733, 742, 69 S.Ct. 1210, 93 L.Ed. 1659, and the profits were properly determined to have gone first to the corporation and, *thence diverted for the purposes of its principal stockholder, on which he must pay taxes as though it were actually distributed as a dividend.*" [21] (Emphasis added.)

▮ In the same case certain secret profits were received by another partnership, one of the members of which was a salaried cattle buyer for the company. The Court held that

"the full amount of the partnership profit was due the corporation." [22]

The cited case seems to indicate a pattern very similar to the pattern which exists here,—dealing with ostensible partnerships which are really dominated by one person who receives the profits and distributes them as he chooses. Significantly, in that case the same complaint was made as is made here that the tax was not computed correctly because the taxpayer's estimates were disregarded. The answer of this Court was:

> "Of course, under such circumstances neither the Tax Court nor the Commissioner is required to follow the taxpayers' estimates '[T]he Commissioner may determine the amount of income received by a taxpayer upon any reasonable basis.'
> * * *
>
> "While perhaps such estimates were not particularly generous to taxpayer, as the Commissioner contends there is sufficient evidence to sustain them, and we cannot hold they were clearly erroneous." [23]

▮ In this and other cases courts apply the principle that where controlling stockholders divert corporate income to themselves

"such diverted funds should be treated as constructive dividends." [24]

21. Union Stock Farms v. C.I.R., supra Note 3, 265 F.2d at page 722.

22. Union Stock Farms v. C.I.R., supra Note 3, 265 F.2d at page 723. This Court, in an earlier case, in which it was claimed that the income *was not* that of a corporation, gave this answer: "The answer is, that the corporation *has performed the services which create the right to the income which brings into play the basic rule that income shall be taxed to him who earns it.*" United States v. Lynch, 9 Cir., 1951, 192 F.2d 718, 721. (Emphasis added.)
This accords with the principle declared by the Supreme Court:
"*The power to dispose of income is the equivalent of ownership of it. The exercise of that power to procure the payment of income to another is the enjoyment and hence the realization of the income by him who exercises it.*" Helvering v. Horst, 1940, 311 U.S. 112, 118, 61 S.Ct. 144, 147, 85 L.Ed. 75. (Emphasis added.)

23. Union Stock Farms v. C.I.R., supra Note 3, 265 F.2d at pages 721–722.

24. Simon v. C.I.R., 8 Cir., 1957, 248 F.2d 869, 873. This case is cited with approval by this Court in Union Stock Farms v. C.I.R., supra Note 3, 265 F.2d at page 721, where the Court applies the same principle to the reverse situation, that is, where, although money is received by employees, the corporation is charged with its receipt and taxed accordingly.
In another case, where the Tax Court had found that the shareholders had received the proceeds of the sales at-

Allusion has already been made to the fact that the taxpayer, in his testimony, spoke of the business of the various agencies through which he acted as "my business", and insisted that he "owned them" and "was responsible for them". So in charging him with the income and profits of these agencies the Tax Court merely took him at his word and correctly taxed him as the *recipient* of the income.

## IV

### The Camille Pitts Account

The taxpayer insists that the Tax Court erred in sustaining the Commissioner's inclusion in his income for 1935 deposits of $44,383.19 in an account held in the name of Miss Camille Pitts in the Lake Shore Trust and Savings Bank, Chicago, Illinois. The taxpayer admitted that the account was his but denied that the money was income to him.

Miss Pitts was his bookkeeper and it was stated by him and Miss Pitts, at the trial, that the account was opened in her name so that she might pay his bills when he was out of town.

It has been admitted that during most of 1935 and 1936 the taxpayer was a resident of California. The taxpayer maintained that in 1935 he was not engaged in any business. For the year 1936 he made a return in which he claimed a loss. He gave his occupation "Investments".

In asking us to find error in this ruling the taxpayer refers to the well established rule that uncontradicted testimony cannot be disregarded.[25] But in these and other cases, to which the taxpayer refers, the courts, in reversing the finding of a lower tribunal, were satisfied that there was clear, convincing and uncontradicted testimony to establish the facts which the lower tribunal had disregarded or that its action was arbitrary and capricious.[26] This is not the situation here. On the contrary, it may be stated that the testimony of both the taxpayer and Miss Pitts, relating to the account, the manner in which large

tributable to the corporation but unreported by it, this Court ruled that they *"are taxable as dividends to those shareholders to the extent of the corporation's earnings and profits."* Clark v. C.I.R., 9 Cir., 1959, 266 F.2d 698, 709. (Emphasis added.)
These rulings accord with the principle that no matter what form a transaction may take,
"The incidences of taxation depends upon the substance of a transaction." C.I.R. v. Court Holding Co., 1945, 324 U.S. 331, 334, 65 S.Ct. 707, 708, 89 L. Ed. 981.
In another case the Supreme Court has stated:
"We cannot too often reiterate that 'taxation is not so much concerned with the refinements of title as *it is with actual command over the property taxed—the actual benefit for which the tax is paid.*' Corliss v. Bowers, 281 U.S. 376, 378, 50 S.Ct. 336, 74 L.Ed. 916. And it makes no difference that such 'command' may be exercised * * through the interposition of a subservient agency. * * * 'A given result at the end of a straight path,' this Court said in Minnesota Tea Co. v. Helvering, 302 U.S. 609, 613, 58 S.Ct. 393, 395, 82 L.Ed. 474, 'is not made a

different result because reached by following a devious path.' * * * Taxes cannot be escaped 'by anticipatory arrangements and contracts however skilfully devised * * * by which the fruits are attributed to a different tree from that on which they grew.'" Griffiths v. Helvering, 1939, 308 U.S. 355, 357–358, 60 S.Ct. 277, 278, 84 L. Ed. 319. (Emphasis added.)

25. Chesapeake & Ohio Railway Company v. Martin, 1931, 283 U.S. 209, 215–220, 51 S.Ct. 453, 75 L.Ed. 983; Pence v. United States, 1942, 316 U.S. 332, 339–340, 62 S.Ct. 1080, 86 L.Ed. 1510; Nicholas v. Davis, 10 Cir., 1953, 204 F.2d 200; Grace Bros., Inc. v. C.I.R., supra Note 16, 173 F.2d at page 174; Sharaf v. C.I.R., 1 Cir., 1955, 224 F.2d 570, 572.

26. Helvering v. Taylor, 1935, 293 U.S. 507, 514–516, 55 S.Ct. 287, 79 L.Ed. 623; Pittsburgh Hotels Co. v. C.I.R., 3 Cir., 1930, 43 F.2d 345, 347; Lunsford v. C.I.R., 6 Cir., 1933, 62 F.2d 740, 742; Blackmer v. C.I.R., 2 Cir., 1934, 70 F.2d 255, 257; Nicholas v. Davis, supra Note 25, 204 F.2d at page 202; Sharaf v. C.I.R., supra Note 25, 224 F.2d at page 572.

numbers of checks were written to "cash" and not accounted for on any books of account, or satisfactorily explained in the testimony, called for the application of the rule already adverted to that testimony inherently improbable need not be accepted.[27]

Without going into a detailed analysis we advert to certain contradictions in the record which justified the Tax Court in not relying upon the testimony introduced in support of the claim that the bank account did not represent income.

The account was opened in Miss Pitts' name in the latter part of 1934. An entry in it shows a deposit for January 13, 1935 in the amount of $15,000. The witness had stated that up to the end of June 1935 the taxpayer had not been engaged in any business but was liquidating a trust fund. As to the source of the money her answer is characteristic:

"A. I have really tried to remember, and I just—the only moneys that I could remember was that there was some jewel sold. Some mortgage moneys that were due and that is the only thing it could possibly be.

"Q. Were there any loans made? A. I think I did try to make some loans for Mr. Factor, and did negotiate for some but I don't remember the amounts."

 She was equally uncertain as to the source of another $15,000.00 which the taxpayer himself admitted was put into the account and came, according to him, from pawning jewelry or borrowing money on jewelry or

"*sale of property or mortgages, whatever they might have been*".

No claim was ever made for interest paid on any of these loans. Nor were any records from persons or organizations to whom the jewels were pawned or sold produced, although allegedly the sales were made in Chicago. It is matter of common knowledge that strict accounting is required under State and Municipal laws for persons dealing in or pawning jewels because of the facility with which stolen jewels may be hidden from circulation until they cease to be "hot". Nor was deduction made in 1935 for interest paid for money allegedly sent to the Nevens organization in England,— claimed to have been borrowed from a California bank.

Large sums of money payable to currency, variously identified as "Currency", "Currency 1", "Currency 2", went through the account. As to some of these the testimony of Miss Pitts was that they were paid to the taxpayer or others at his direction. Those marked "Currency 1" were, presumably, paid to him. Miss Pitts testified that check transfers made out to H. Crane, J. Richards, J. Richard, Abe Shore, William Bleet, W. D. Barkley and others, were signed by the taxpayer and cashed by him. Harry Crane testified that he did not receive the proceeds of checks bearing his name as payee. The taxpayer claimed he did not receive them either, but that they were merely an accommodation to enable the checks to be cashed by Crane.

27. See cases cited in Notes 14, 15 and 17. See also, Carmack v. C.I.R., 5 Cir., 1950, 183 F.2d 1, 2, where the court, in upholding the ruling of the Tax Court, in a "net worth" case, in disregarding the *uncontradicted testimony of the taxpayer and his wife*, unsupported by written records, said:
"Here, the taxpayer testified generally that his evidence was based on vouchers, records, and other documents, but introduced none of them in evidence in corroboration of his testimony. *He swore that he kept no regular records. Under the circumstances, the Tax Court was not bound to believe or to accept the uncontradicted testimony of taxpayer and his wife, where such testimony patently appears highly improbable or manifestly unreasonable.*" (Emphasis added.)
A similar ruling was made in Wood v. C.I.R., 5 Cir., 1952, 197 F.2d 859, 860, on the disallowance of claimed cost of stocks by a dealer in securities. The Tax Court may accept parts and reject other parts of a witness's testimony. Archer v. C.I.R., supra Note 3, 227 F. 2d at page 273; Baumgardner v. C.I.R., supra Note 14, 251 F.2d at page 321; Clark v. C.I.R., supra Note 17, 266 F. 2d at pages 708–709.

Throughout his testimony, the taxpayer's pattern was the same. The only instances in which he admitted receiving the proceeds of H. Crane or Harry Crane checks or any other moneys, for that matter, was when the Government produced a draft or telegraphic transmittal to trace the money directly to him. Indeed, as we read the transcript and the testimony of the taxpayer he seems to assume, in an "injured" manner, that, for some reason or other, the Government should produce evidence as to the provenance of these funds and that they were received by him. Even when admitting that he received one such check, he gave the following explanation:

"Q. (By Mr. Sher): There were drafts issued in the name of Harry Crane during this period in 1935. *Mr. Crane testified that he didn't receive these funds and we have stipulated that they are chargeable to you.*

"Can you tell us why these drafts were written in the name of Harry Crane? A. Well, I, unfortunately, was kidnapped and had a lot of publicity and I didn't want to get my name in again. He was my friend and I said, 'Do you mind if I get this check made payable to you? When you get it you can give me the money,' and that is about the size of it."

Asked to explain why he did not report any of the sums received from Canada in his income returns of 1935 and 1936, he gave this answer:

"A. Well, the best explanation that I can give you is that I did—there was a lot of money going out that I am today unable to account for, that there wasn't any profits—in my humble opinion now. I can be wrong.

"Q. You do say you didn't report them because in your opinion you didn't make any profits during those years? A. This is right, and I also was under the impression, Mr. Sher, that in selling jewelry that there were some losses. There were some losses on mortgages that I sold and

between the two of them there certainly was not any profit."

He was aware that money was being received in the Montray account and he admitted that he would call the Canadian office and ask that money be withdrawn for his benefit:

"Q. You were fully advised, I take it at all times about the receipt of funds by those corporations from England? A. Yes, I would call up and see what shape they were in, whether they had money, whether they were buying shares, whether they had money on hand or did not have money on hand.

"Q. In those telephone calls to Montray, to these two corporations, would you make requests that funds be withdrawn for your benefit, Mr. Factor? A. Yes, I did."

He denied that the numerous currency checks in such amounts as $3,000.00, $4,000.00, $23,000.00 and $14,000.00 endorsed "currency H. C." were received by him, although so testified to by Miss Pitts. When this contradiction was called to his attention his answer was

"A. *I heard her testify to that. Now, I can't recollect and say that that was it. I couldn't say that, because in some instances, I can't see the reason for it, to be very honest with you. I am trying to reason it out, and that reason it just doesn't come back to me.*"

He denied the statement of Lee Gordon that he gave him the proceeds of checks made out to him as payee. As to these Lee Gordon's testimony, which the Tax Court believed, was very persuasive.

█ It would serve no useful purpose to take up other items as to which the testimony of the taxpayer was evasive, uncertain and lacked persuasiveness. What precedes is sufficient to indicate that the discrepancies, contradictions and improbabilities in the narration of the facts by the taxpayer and his witnesses warranted the Tax Court in including in its computation of the income the amount

of $44,383.19 from the Camille Pitts bank account. We shall refer to others when we comment on the testimony of Harry J. Goulding. (Part V-4 of this opinion)

This is not a net worth case. The deficiency notice was based upon the failure to report at all or to report correctly specific items of income. The absence of books or records reflecting accurately income and claimed deductions may have made it difficult for the taxpayer to meet the burden resting upon him to prove that he was entitled to certain deductions. But that difficulty was of the taxpayer's own creation.

 Even in a net worth case proof of a likely source is not

"necessary in every case. On the contrary, should all possible sources of nontaxable income be negatived, there would be no necessity for proof of a likely source." [28]

The fact that the taxpayer admitted gambling and losing heavily may lead to the conclusion that, unless he lacked normal intelligence, he would not have continued to gamble and lose continuously.

A shrewd speculator of the type of the taxpayer who, in one year reported sales on the stock market amounting to over $200,000.00 and who, according to Miss Pitts, at one time, had an account up to a million dollars with reputable brokers, would not, when "the chips were down" continue to gamble. Rather, it may be assumed, as the Tax Court did, that there were gambling profits to which the unexplained income could be traced. But, with or without such assumption, the Tax Court was correct in reaching its conclusion on the subject of the Camille Pitts account.

## V

### The Consolidated Diana Transaction

The taxpayer argues that the sum of $53,000.00 in disbursements made by Montray for the purchase of the assets of a bankrupt corporation, Diana Gold Mines, Ltd., which assets were exchanged for the capital stock in Consolidated Diana, should have been allowed as an expense in the acquisition of stocks for resale.

The facts relating to this matter were, briefly these: The taxpayer, in 1936, through his New York Attorney, A. C. Berman, now deceased, entered into negotiations which resulted in the purchase, by Consolidated Diana, of the assets of the bankrupt Canadian gold mining corporation for $80,000.00. Montray provided $53,000.00 towards the purchase of the stock. The assets acquired from the bankrupt corporation were transferred to Consolidated Diana in exchange for 1,000,000 shares of its capital stock. Other facts relating to the disposition of these shares will be adverted to as we consider the problem.

1. *The Interrelation Between the Canadian Corporations*

For a correct understanding of the matter some additional facts should be stated, other than previously given (Part I of this opinion), showing the relationship between the various media through which the taxpayer received income or used as agencies in the conduct of his affairs. As already stated, Montray was a Canadian corporation organized on July 4, 1935, under the laws of the Province of Quebec, Canada. The taxpayer was not an officer of the corporation. Its nominal organizers and officers were salaried employees of the taxpayer. None of them

28. United States v. Massei, 1958, 355 U.S. 595, 78 S.Ct. 495, 2 L.Ed.2d 517. Apposite to the facts here is the language of the Court of Appeals for the Fifth Circuit in a similar case: "Where, as here, the records kept by the taxpayer are manifestly inaccurate and incomplete, the Commissioner may look to other sources of information to establish income, and may take into account, as prima facie evidence of income, bank deposits made by the taxpayer during the years in question." Boyett v. C.I.R., 5 Cir., 1953, 204 F.2d 205, 208. (Emphasis added.)

owned any of its capital stock or had any investment in it. The principal duty of the President of Montray was the signing of checks issued by the Corporation. The Tax Court found that Montray was "wholly owned and controlled by" the taxpayer, a fact which he, at all times, concealed.

Gold Underwriters, Ltd., also a Canadian corporation, was organized in 1933. After being inactive it was activated in October, 1936, when three shares of its stock were issued, one share each, to employees, none of whom paid anything for the shares, but who were elected directors and officers of the corporation. The corporation's office was in the apartment of Louis Pitts, one of the taxpayer's employees. The duty of the President was to sign checks in blank, turn them over to Pitts who filled in amounts, payees and countersigned them. On this basis, the Tax Court found that this corporation also was "wholly owned and controlled" by the taxpayer who, at all times, attempted to conceal the fact.

The taxpayer was not an officer of the corporation, but, as the Tax Court found, was, at all times, the beneficial owner of all its capital stock. It succeeded Montray after Montray became inactive.

Nevens was an ostensible partnership organized in England, in 1935, composed of C. Rankin Nevens and Harry J. Goulding, a British subject, who is a brother-in-law of the taxpayer. The partners were, in reality, employees of the taxpayer. They did not contribute any money to Nevens and had no experience in dealing in securities. The taxpayer contributed the capital with which Nevens began business. The partners received a salary of $100 per week. As to Nevens this continued for a year after the English activities ceased and he returned to the United States. The tax-

payer hired its salesmen, dominated and controlled its activities. The Tax Court found correctly he

"was the owner of its assets and income."

■ The undisputed rule is that, because of the failure of the taxpayer to keep books clearly reflecting his income, the Commissioner had the right to compute the income

"in accordance with such method as in the opinion of the Commissioner does clearly reflect the income."[29]

But the taxpayer argues that, in the interest of consistency, the Commissioner should have treated this transaction as he did another transaction, the Kirkland Gold Rand stock acquisition, and that it was error to treat Kirkland as a "course of trade" sale and Consolidated Diana as an investment.

■■ The cases require the Commissioner to follow a consistent and uniform pattern only where the business of the taxpayer is such a unit that it should not be segmentized and each of the parts be treated separately.[30] But here we are dealing with a group of separate transactions carried on by the taxpayer *through different media*. So the conclusion reached by the Tax Court must be evaluated as to each separately. And the conclusion reached as to one operation, on one set of facts, does not, necessarily, command a similar decision as to another, based upon a different set of facts.

■ The nature of the Consolidated Diana transaction has already been set forth in the outline of facts (Part I of this opinion). As the taxpayer concedes that the basic facts relating to this transaction are correctly stated in the Tax Court's opinion, we print in the margin the portions of the findings referred

---

29. 1934 Rev.Act, § 41, 48 Stat. 694, ch. 277, § 41, 26 U.S.C.A. Int.Rev.Acts, page 679. 1936 Rev.Act, § 41, 49 Stat. 1666, ch. 690, § 41, 26 U.S.C.A. Int.Rev.Acts, page 838; Regulations 86, Art. 41-1, Official Text, p. 107; Regulations 94, Art. 41-1, Official Text, p. 140.

30. This was the situation in Harden v. C.I.R., 10 Cir., 1955, 223 F.2d 418, 420-421, relied on by the taxpayer. There, the Commissioner, in computing income from a mausoleum, had sought to segmentize the owner's business into divisions and tax them as though they were separate businesses.

to.[31] The conclusions of the Tax Court stated in the same finding that Montray never acquired the shares of stock, never had them in its possession, but that, on the contrary, they were acquired for the taxpayer and that the money disbursed by Montray for their acquisition was income, find support in the record.

There is proof in the record that the stock certificates for a million shares were sent to a nominee in New York, Herbert R. Ebenstein, who gave them to the taxpayer in person in the presence of his Canadian attorney, Mr. Shulman, who organized the various corporate entities and testified at the trial. The 200,000 shares were released for sale. Of this number 174,125 were sold. The remain-

ing 25,857 shares of the original 200,000 shares and the 800,000 shares of treasury shares are still held for the taxpayer. This is made clear by the testimony of Mr. Shulman. He has been paying the annual taxes on the mining property held by Consolidated Diana and was of the view, at the time of trial, that the property had value. He considered all the Canadian companies and individuals connected with them as constituting "one operation" and kept all funds transmitted to him as coming and belonging to "the principal in the operation" and, according to him, the "principal was Mr. Factor".

2. *The Kirkland Transaction*

Compared to Montray's involved affairs the transaction as to the acquisition of

31. "Of the amount in dispute for 1936, $53,000 represents disbursements of Montray for the purchase of capital stock of Consolidated Diana Gold Mines, Ltd., hereinafter referred to as Consolidated.

"The predecessor of Consolidated Diana Gold Mines, Ltd., was, in 1936, a Canadian gold mining corporation which was in bankruptcy with its assets for sale. Petitioner, through his attorney, A. C. Berman, entered into negotiations with Louis Leipsic of Winnipeg, Canada, with a view towards acquiring the assets of the bankrupt corporation. As a result of the negotiations, it was agreed that $80,000 would be advanced to Leipsic, who would acquire the assets and transfer those assets to a new corporation, Consolidated, in exchange for the 1,000,000 shares of capital stock of Consolidated. Of the $80,000 paid for the assets, Montray provided $53,000 in 1936; Gold Underwriters provided $1,-000 in 1937; and the petitioner provided $25,000 in 1936 through a nominee, Herbert R. Ebenstein. The record does not disclose the source of the remaining $1,000.

"The million shares of stock were issued originally in the name of Ebenstein and were received by him October 7, 1936. Ebenstein was never the owner of such stock. Petitioner was at all times the beneficial owner of all the capital stock of Consolidated. Shortly after Ebenstein received the shares, he turned them over to petitioner and his attorney and since that time stock has been issued in the name of Canadian Mining and Industrial Securities, Limited, a corporation organized expressly for

the purpose of holding such stock. This stock has never been sold.

"Of the million shares of capital stock issued in exchange for the assets of the bankrupt corporation, it was necessary to place the 800,000 shares of the name of Canadian Mining and Industrial Securities, Limited, in escrow until so-called treasury stock could be sold in sufficient numbers to produce $180,000. Shortly after Consolidated was organized, an agreement was entered into between it and Carlisle Investment Trust Limited of London, England, hereinafter referred to as Carlisle, for the sale of Consolidated's treasury stock to Carlisle at $.90 a share. Carlisle was an organization created in England to engage in the business of selling securities. Nevens, at petitioner's request, furnished the funds with which Carlisle began business. Carlisle was wholly owned and controlled by the petitioner.

"Carlisle purchased and sold in England, pursuant to the agreement, a total of 87,690 shares of treasury stock and remitted to Consolidated a total of $79,-163.50 therefor. By October 1937, Carlisle had also acquired and sold 174,-125 shares of the 200,000 shares of capital stock which were not placed in escrow. The sales price of the shares in England was five shillings, or approximately $1.25 per share. The last sale of this stock was made in October 1937. The remaining 24,875 shares of non-escrowed capital stock have been held since October 1937 in the name of Maurice Shulman. In September 1937 Consolidated closed down its gold mining operations."

Kirkland stock was a simple one. The main facts relating to it are already set forth in a preceding portion of this opinion (Part I). Additional details were given by Mr. Shulman who was Kirkland's attorney in Canada. He represented Kirkland in 1935. They owned copper-gold property in the Kirkland district and had done a good deal of surface prospecting, diamond drilling, had sunk a shaft and were making efforts to develop ore. Their stock was not being traded in because it was a new corporation organized for the purpose of taking over the assets of a previous company, known as Kirkland Premier. However, they had issued a prospectus offering the sale of stock for 35¢ a share.

During May, 1935, Mr. Berman, New York Attorney, came to see Mr. Shulman, informed him that he represented a client who might be able to finance the development of Kirkland if he could obtain an option on favorable terms. Shulman introduced Berman to three of Kirkland's directors who jointly owned 300,000 shares of its stock out of the original one million shares, who finally agreed to sell the shares for $12,535.00,—½ payable on the date of the execution of the agreement, July 3, and the remainder within 60 days. The name of the purchaser was left blank, as Montray had not been organized. There were some modifications made in the agreement. Later Shulman with the consent of the directors of Kirkland, began to represent Montray also. At that time he was informed by Berman that the client he was representing was the taxpayer.

Montray was organized by Berman through another firm of Canadian attorneys. In October 1936 there was a change in the directorate of Montray. Then it was agreed that Montray would surrender its rights under the option and Gold Underwriters would carry on from there.

Gold Underwriters was a company incorporated by Shulman in 1943. It had been inactive. Under the rather liberal corporation laws of Canadian Provinces the Montray group was allowed to use the corporation. Gold Underwriters started doing business early in 1936 and operated until some time in 1937.

Montray and Gold Underwriters acquired, in the years 1935 and 1936, over a million shares of Kirkland stock at various prices making a total of $277,535.00. It is quite clear that, in the circumstances, there was evidence which warranted the Tax Court in holding that the Kirkland acquisition was a sale of stock by owners in the ordinary course of their trade or business or property.

*3. Controlling Law*

The controlling statutes declare that the term "capital assets" does not include

"property held by the taxpayer primarily for sale to customers in the ordinary course of his trade or business."[32]

It is the uniform rule that "capital asset" provisions of this character, in the particular and other tax statutes, are to be construed narrowly. The reason was stated in a noted case:

"Congress intended that profits and losses arising from the everyday operation of a business be considered as ordinary income or loss rather than capital gain or loss. The preferential treatment by § 117 applies to transactions in property which are not the normal source of business income. It was intended 'to relieve the taxpayer from * * * excessive tax burdens on gains resulting from a conversion of capital investments, and to remove the deterrent effect of those burdens on such conversions.' Burnet v. Harmel, 287 U.S. [103], at page 106, [53 S.Ct. 74, at page 75, 77 L.Ed. 199]. Since this section is an exception from the normal tax requirements of the Internal Revenue Code, *the definition of a capital asset must be narrowly*

---

32. 1934 Rev.Act, § 117(b), 26 U.S.C.A. Int.Rev.Acts, p. 707; 1936 Rev.Act, § 117(b), 26 U.S.C.A. Int.Rev.Acts, p. 874.

*applied and its exclusions interpreted broadly.* This is necessary to effectuate the basic congressional purpose. This Court has always construed narrowly the term 'capital assets' in § 117." [33] (Emphasis added.)

■ The Regulations carry over the distinction by distinguishing between securities held for the purposes of resale and those held for investment. And they specifically state:

"Taxpayers who buy and *sell or hold securities for investment or speculation,* irrespective of whether such buying or selling constitutes the carrying on of a trade or business, and officers of corporations and members of partnerships who in their individual capacities buy and sell securities, *are not dealers in securities within the meaning of this rule."* [34] (Emphasis added.)

Under these legal norms and regulations, courts allow any person to deal in securities for sale or investment with the consequential tax incidences which attach to them. When one person deals in securities in both categories and a question arises before the Tax Court, the issue becomes a question of fact to be determined by that Court. As stated in one case:

"*With respect to some of the securities sold the taxpayer may have been a dealer and with respect to others a trader, investor or speculator. In his returns he made no attempt to distinguish one sale from another; nor did he present sufficient evidence to enable the Tax Court to do so."* [35] (Emphasis added.)

And the finding will not be disturbed unless wholly unsupported by any facts in the record. When an adverse finding was challenged by a broker, the Court of Appeals for the Third Circuit answered:

"Under the terms of the above-quoted regulation, the right to inventory securities is denied when *such securities are purchased either for investment or speculation.* As we view the facts, *the petitioner purchased the securities in the third class of transactions solely for speculation and not for resale to customers in his capacity as to a dealer in securities.* The facts stipulated, as well as the testimony taken before the Board of Tax Appeals, sustain the Board's findings on this issue. We find no error in the decision of the Board upon the merits of the case." [36] (Emphasis added.)

### 4. Credibility of Harry J. Goulding

The Tax Court has stated that much of the testimony relating to this transaction

"consisted of the vague assertions by petitioner's brother-in-law, Harry J. Goulding."

In view of this and the fact that reliance is placed on his testimony, also, for the purpose of supporting the claim of realization, first from pawning and then from selling in England certain jewelry belonging to the taxpayer, we review this testimony.

While claiming that he pawned the taxpayer's jewelry several times and later sold it for over 10,000 pounds, the equivalent of $50,000.00 at the then rate of exchange, he did not produce any documents to substantiate these claims. Although he had had no experience as a stock sales-

33. Corn Products Refining Co. v. Commissioner, 1955, 350 U.S. 46, 52, 76 S. Ct. 20, 24, 100 L.Ed. 29.

34. Regulations 94, Art. 22(c)–5, Official Text, p. 42. The provisions of the 1934 regulations are identical as to numbering and text. See, Regulations 85, Art. 22 (c)–5, Official Text, p. 33–34.

35. Van Suetendael v. C.I.R., 2 Cir., 1945, 152 F.2d 654, 655; As to right to engage in more than one business see the clear

and forthright statement of the court in United States v. Bondurant, 6 Cir., 1957, 245 F.2d 265, 268.

36. Hammitt v. C.I.R., 3 Cir., 1935, 79 F.2d 494, 495. See, Adams v. C.I.R., 8 Cir., 1940, 110 F.2d 578, 582–586; Faroll v. Jarecki, 7 Cir., 1956, 231 F. 2d 281, 286–288. See also, Estate of Ferber, 1954, 22 T.C. 261; Pool v. C.I.R., 9 Cir., 1957, 251 F.2d 233, 235–238.

man, he was sent to England to sell stock. He had no proprietary interest in the Nevens partnership, being only one of two ostensible partners. The business was wholly owned and controlled by the taxpayer.

In 1943, Goulding denied that the taxpayer had any connection with Nevens. Only a day or so before the trial did he tell the agents of the Commissioner about the $25,000.00 he claimed to have taken to England. He gave this as the reason for the concealment:

> "I told you, sir, that * * * I wanted to cooperate with you and tell you everything about the entire case; *that I tried to keep Mr. Factor's name out of it when I was first interveiwed in California and the reason I did that in California, he was having a bad time there and I wanted to keep his name out as much as I could."*

The alleged dealings with the jewelry were also disclosed to the agents of the Commissioner for the first time a day or so before the trial. So evasive were some of his answers that when counsel for the taxpayer sought to have him explain the contradictions, he repudiated his own testimony given in court. We quote from the record:

> "Q. (by Mr. Sher): Mr. Goulding, this morning I asked you who advanced the money for your first trip to England and *you said Mr. Factor.* Then on cross examination, in response to a question by Mr. Donoghue, you said *Mr. Factor did not advance the money.*
>
> "Now, I would like to have you tell us which of these answers is correct. *Did he or didn't he?* A. *He advanced the money.*
>
> "Q. Why did you say on cross examination that he didn't? A. Well, for this reason; When Mr. Donoghue showed me that document that I had signed in California, I stated

there that Mr. Factor did not advance me the money. However, as I said, *I didn't want to have Mr. Factor with all this trouble on his shoulders when this first thing came up and that is the reason why I said it and anything I have said here in Court is the truth.*

> "Q. The truth is which, he did or did not advance the money? A. *He did, sir, and what I said about him not advancing me the money there is not true. * * * "*

■ Because of the manner in which the facts were concealed originally and covered up during the investigation, the Commissioner's task in reconstructing the income was made very difficult. But for the cooperation of Canadian authorities and banking institutions in this country, Canada and England, no facts could have been produced. The taxpayer makes much of the fact that most of the witnesses which he called had been subpoenaed by the Government. When a party calls a witness, whether subpoenaed by him or not, he vouches for the truth of his testimony. So when the taxpayer called Goulding and others who had been subpoenaed by the Government he vouched for their veracity, was bound by their testimony and could not impeach them.[37] But the Tax Court was not bound to accept it if it was

> "indefinite, uncorroborated, conflicting, fantastic or unrealistic." [38]

This is quite evident from the preceding analysis, especially the testimony relating to the alleged pawning and sale of jewelry in England. As shown, Goulding mentioned that only a day or so before the hearing in the Tax Court. The taxpayer followed the same course, mentioning the matter for the first time at the hearing before the Tax Court.

If, as the Tax Court found, the Consolidated Diana shares were held for investment, no claim could be made by the taxpayer for deduction of the money it

**37.** 98 C.J.S., Witnesses, § 477(a) (b), pp. 355–358; 58 Am.Jur., Witnesses, § 791, pp. 437–440.

**38.** Winters, v. Dallman, supra, Note 17, 238 F.2d at page 914.

may have contributed toward their cost. Montray could claim reimbursement for money advanced for the benefit of another or, if it claims that the stock is worthless, it could claim the deduction as a bad debt.[39]

But Montray was not before the Tax Court. All that the Tax Court did in this matter was to say that the taxpayer received certain moneys, through Montray, which should be included *in his gross income*. It did not purport to take an accounting of the business activities of Montray or those who received its funds, whether the taxpayer or others. Nor should the case be sent back to the Tax Court, as suggested by the taxpayer, for the purpose of such accounting, as Montray is a foreign corporation not receiving any income from sources in the United States for which it is required to make a return.[40]

 So the matter may be summed up in this manner: The original petition did not specify the failure to allow the advances alleged to have been made by Montray as an error, although it did complain of the inclusion of certain moneys from Montray as income. Neither did the amended petition. The Tax Court correctly held that the assignment as to this point was "too general". The Tax Court found no credible proof that any of the proceeds of the sale of stock of Consolidated Diana reached Montray. Significantly, the Tax Court found:

> "Montray received its final remittance from Nevens before the 1,000,-000 shares were issued by Consolidated in Ebenstein's name, therefore, Montray could not have received money from Nevens for the sale of such stock in England."

 The taxpayer was not a dealer in securities. His income tax return for 1935 listed no occupation. That for 1936 gave his occupation as "investments". The burden to show that he was entitled to the deductions was on the taxpayer. He did not meet it. The Tax Court found correctly that

> "The fact petitioner did not prove that any part of the proceeds from the sale of Consolidated stock reached Montray and Gold Underwriters and, therefore, was not included in his income by respondent, would also preclude the reduction of such income by taking any part of the cost price of the stock as cost of goods sold."

## VI

### The Failure to Consider Claimed Disbursements

The taxpayer complains that the Tax Court erred in refusing to consider and allow business expenses and costs claimed as deductions in connection with his Montray and Gold Underwriters operations. The conclusion of the Tax Court that the matter was not properly before it was stated in this manner:

> "We therefore hold that under the pleadings, no issue has been raised as to deductions claimed on trial and brief relating to the operations of Montray and Gold Underwriters in addition to those allowed by the respondent."

 It is the contention of the taxpayer that because there was testimony in regard to these items the Tax Court should have determined the correctness of the claimed deductions. Neither in the petition nor in the amendment to it were the claimed expenses set forth in detail. It should be borne in mind that the Federal Rules of Civil Procedure do not apply to the Tax Court.[41]

39. See, Perry v. C.I.R., 1954, 22 T.C. 968, 974–975.

40. A foreign corporation not engaged in business in the United States nor having an office in the United States nor receiving income from sources within the United States was not taxable during the years involved. 1936 Rev.Act, § 119, 26 U.S.C.A. Int.Rev.Acts, page 876; C.I.R. v. East Coast Oil Co., 5 Cir., 1936, 85 F.2d 322; C.I.R. v. Piedras Negras Broadcasting Co., 5 Cir., 1942, 127 F.2d 260. Cf. C.I.R. v. Hawaiian Philippine Co., 9 Cir., 1939, 100 F.2d 988. And see generally, 8 Mertens, Law of Federal Income Taxation, 1957, §§ 45.21–45.26.

41. Katz v. C.I.R., 2 Cir., 1951, 188 F.2d 957, 959; Lasky v. C.I.R., 9 Cir., 1956,

Under the clear mandate of a statute [42] the Tax Court is given power to promulgate its own rules of practice and procedure. Under this mandate and under similar mandates contained in earlier statutes, the Tax Court has formulated its own rules of practice.[43] Under Rule 7 the taxpayer is required to state the following:

"4. Clear and concise assignments of each and every error which the petitioner alleges to have been committed by the Commissioner in the determination of the deficiency. Issues in respect of which the burden of proof is by statute placed upon the Commissioner will not be deemed to be raised by the petitioner in the absence of assignments of error in respect thereof. Each assignment of error shall be lettered.

"5. Clear and concise lettered statements of the facts upon which the petitioner relies as sustaining the assignments of error, except those assignments of error in respect of which the burden of proof by statute is placed upon the Commissioner.

"6. A prayer, setting forth relief sought by the petitioner." [44]

The original petition stated that the Montray and Gold Underwriters disbursements were erroneously included in the taxpayer's income. No detailed facts were given. The amendment to the petition assigned as additional error:

"1. (j) Failure to allow as deductions various costs and expenses in connection with the alleged income considered as received by the Petitioner and referred to in subparagraphs (a) and (d) [of par. 4] of the original petition."

■■■■ These statements of errors in the determination of taxes and penalties in the notice of deficiency were insufficient to raise the issue.[45] The rules of the Tax Court do not contain a provision comparable to the provision of the Federal Rules of Civil Procedure allowing findings to be made on issues tried which were not pleaded, with or without amending the pleadings.[46] On the contrary, its rules provide that motions to amend to conform to the proof must be made by the parties.[47] No such motion was made here.[48]

In interpreting these rules and their predecessors, the courts have held that both parties are limited to the claims asserted in their pleadings.[49] In rejecting

235 F.2d 97, 98; C.I.R. v. Licavoli, 6 Cir., 1958, 252 F.2d 268, 272.

42. 26 U.S.C. § 7453.

43. Federal Tax Regulations, 1960 U.S. Code Congressional and Administrative News, Ch. 2, Pt. 701, p. 2173 et seq.

44. Rule 7, loc. cit., p. 2177.

45. Bennett v. C.I.R., 8 Cir., 1944, 139 F. 2d 961, 965.

46. Rule 15(b), Federal Rules of Civil Procedure, 28 U.S.C.

47. Tax Court Rules of Practice, loc. cit., Rule 17(c, d), p. 2179.

48. C.I.R. v. Sussman, 2 Cir., 1939, 102 F. 2d 919, 922; C.I.R. v. Erie Forge Co., 3 Cir., 1948, 167 F.2d 71, 74.

49. Moise v. Burnet, 9 Cir., 1931, 52 F. 2d 1071, 1073; C.I.R. v. Sussman, supra Note 48, 102 F.2d at page 922. As this Court said in Moise v. Burnet, supra, 52 F.2d at page 1073:

"The Commissioner did not properly 'assert' 'claims' for additional deficiencies, in the amended answers filed by him before the Board. The rule that tax statutes should be liberally construed in favor of the taxpayer clearly requires that a claim should be actually and definitely made, and not left to conjecture, inference, or interpretation. No words of claim, request, or demand were used by the Commissioner. *He must be bound by his pleadings, and cannot be assumed to have intended to present a claim that he did not actually assert.* This is especially true, as Member Van Fossan points out in his dissenting opinion, concurred in by Member Lansdon, inasmuch as the prayer in each of the amended answers filed by the Commissioner merely asks 'that the appeal be denied.' *'The relief demanded is gauged by the prayer.'* United States v. Sloan Shipyards Corporation et al. (D.C.) 270 F. 613, 617, 618, and California cases there cited." (Emphasis added.)

the claim of the Commissioner that a *contention in a brief* relating to certain stock could be considered a claim for increased deficiencies authorizing the Board to compute the correct tax liability, the Court said:

"There are several answers to this contention. The assertion of such a claim would amount to the injection of a new issue into the proceedings, and since it was not properly pleaded the Board presumably would not consider it in accordance with its usual practice. Certainly, we could not say that it would abuse its discretion in failing to do so. Cf. Moise v. Burnet, 9 Cir., 52 F.2d 1071; Cascade Milling & Elevator Co. v. Commissioner, 25 B.T.A. 946." [50]

In the light of these rulings the Tax Court was right in declining to determine the correctness of the claimed allowances for expenses.[51] This conclusion makes it unnecessary to consider whether the

50. C.I.R. v. Sussman, supra Note 48, 102 F.2d at page 922. The cases cited in this and in the two preceding notes, 48 and 49, have been followed consistently. And even refusal to allow amendments to pleadings to raise new issues have been held discretionary with the Tax Court, not to be interfered with except for palpable abuse of discretion. See, Skenandoa Rayon Corporation v. C.I.R., 2 Cir., 1941, 122 F.2d 268, 271; Tonopah Mining Co. of Nevada v. C.I.R., 3 Cir., 1941, 127 F.2d 239, 245; C.I.R. v. Erie Forge Co., supra Note 48, 167 F.2d at pages 74–78; C.I.R. v. Licavoli, supra Note 41, 252 F.2d at pages 272–273. Cf. Chiquita Mining Co., Ltd. v. C.I.R., 9 Cir., 1945, 148 F.2d 306, 310. See, Perry, 1954, supra Note 39, p. 975; Camp Wolters Enterprises, Inc., 1954, 22 T.C. 737, 755.

51. The cases referred to by the taxpayer are not contrary to these rulings and are clearly distinguishable. To illustrate: They are either general statements as to liberality which apply to the *federal rules only* (Conley v. Gibson, 1957, 355 U.S. 41, 47–48, 78 S.Ct. 99, 2 L.Ed.2d 80) or cases where evidence was offered and there was arbitrary refusal to permit the pleadings to be amended to conform to the proof, (International Banding Mach. Co. v. C.I.R., 2 Cir., 1930, 37 F.2d 660) or where the courts determined the correctness of a legal conclusion based on undisputed facts in the record, (Starr v. C.I.R., 4 Cir., 1936, 82 F.2d 964, 967; C.I.R. v. Multnomah Operating Company, 9 Cir., 1957, 248 F.2d 661; United States v. Hover, 9 Cir., 1959, 268 F.2d 657, 665) or the statute of limitations was clearly involved, (Cutcliffe v. C.I.R., 5 Cir., 1947, 163 F.2d 891) or equitable consideration warranted a liberal view as to issues before the Tax Court. (C.I.R. v. Finley, 10 Cir., 1959, 265 F.2d 885, 888) In the case just cited an amended answer was *actually* filed after trial but before decision. So the general statement which would apply to the Tax Court the power given to district courts by Rule 15(b), Federal Rules of Civil Procedure, is dictum and not binding in subsequent litigation. Apposite here is the classic statement of Mr. Chief Justice Marshall in Cohens v. Commonwealth of Virginia, 1821, 6 Wheat. 264, 399–400, 5 L.Ed. 257:

*"It is a maxim, not to be disregarded, that general expressions, in every opinion, are to be taken in connection with the case in which those expressions are used. If they go beyond the case, they may be respected, but ought not to control the judgment in a subsequent suit, when the very point is presented for decision.* The reason for this maxim is obvious. The question actually before the court is investigated with care, and considered in its full extent. Other principles which may serve to illustrate it, are considered in their relation to the case decided, but their possible bearing on all other cases is seldom completely investigated." (Emphasis added.)

This principle justifies us in disregarding as inapplicable here the general language condemning the adoption by administrative bodies of the "rigidities" of common law procedure used in Vita-Food Corporation v. C.I.R., 9 Cir., 1956, 238 F.2d 359, 363, and repeated in Schmidt v. C.I.R., 9 Cir., 1959, 272 F.2d 423, 427. In both cases the issue raised on appeal,—the claimed credit for the salary of an executive *(in Vita-Food)* and the claimed credit for overpayment in a previous tax year *(in Schmidt)*,— was determined by this Court to have been *clearly and properly* before the Tax Court under the pleadings. Here, as already appears, the issues concerning the claimed added expenditures in 1935 and 1936 were not properly pleaded and the Tax Court was not asked to permit amendments to the petition, as amended, or to conform to the proof.

proof in the record would have warranted a finding for or against the taxpayer on the claimed expenditures. The testimony being contradictory, only the Tax Court could make such a finding. It rightly declined to do so. And we would not be warranted in sending the matter back for redetermination, as this Court has done when it felt that a "miscarriage of justice" would otherwise result.[52] For the record in this case does not engender such feeling in us.

## VII

### Alleged Use of Concessions

### Made During Negotiations

It is insisted that the Tax Court erred in allowing an agent of the Government, Clayton C. Marsh, who participated in various discussions with the taxpayer, to testify, upon the ground that these were admissions made in the course of "attempts to compromise" the tax controversy between the taxpayer and the Government and, therefore, should have been excluded altogether. The Tax Court made no reference to Marsh's testimony, either in its findings or in its opinion. Before considering whether there was error in whatever admissions were made, a brief statement of the law on the subject will be helpful.

The general rule is that an offer to compromise or any statements or admissions made as a part of the compromise negotiations are ordinarily inadmissible.[53] Independent statements of facts made during the course of such negotiations are, however, admissible. This is especially true if

"the party making the proposal apparently intended to make no concession but to exact all that he deemed himself entitled to." [54]

Wigmore, while criticizing some of the reasons given for the rule, states it and the exception in this manner:

"The solution is a simple one in its principle, though elusive and indefinite in its application; it is merely this, that a *concession which is hypothetical or conditional only can never be interpreted as an assertion* representing the party's actual belief, and therefore cannot be an admission; and, conversely, an unconditional assertion is receivable, without any regard to the circumstances which accompany it." [55] (Emphasis in text.)

The Supreme Court of the United States has given recognition to this principle in a noted case:

"By all or nearly all the cases the rule as established is not that an admission made during or in consequence of an effort to compromise is admissible, but that an offer to do something by the way of compromise, as to pay sums of money, *allow certain prices,* deliver certain property, or *make certain deductions,* and the like, shall be excluded. These cannot be called admissions, as they were made to avoid controversy and to save the expenses of vexatious litigation." [56] (Emphasis in text.)

And the test will be applied strictly where the admission cannot be

---

52. Ah Pah Redwood Company v. C.I.R., 9 Cir., 1957, 251 F.2d 163, 169. See, Legg's Estate v. C.I.R., 4 Cir., 1940, 114 F.2d 760, 767; Hormel v. Helvering, 1941, 312 U.S. 552, 556–560, 61 S.Ct. 719, 85 L.Ed. 1037.

53. 31 C.J.S. Evidence § 285; 20 Am.Jur., Evidence, § 565.

54. 31 C.J.S. Evidence § 285(b) p. 1043; See, 20 Am.Jur., Evidence, § 566.

55. IV Wigmore on Evidence, 3rd Ed., 1940, § 1061, p. 26. This has been the

general rule in American courts for a long time. See, Pentz v. Pennsylvania Fire Insurance Co., 1901, 92 Md. 444, 48 A. 139, 140–141; Davidson v. American Cent. Insurance Co., 1923, 80 N.H. 552, 119 A. 707, 709–710; Poole's Seed and Implement Co. v. Rudene, 1921, 117 Wash. 150, 200 P. 1104, 1106; Kelly v. Steinberg, 1957, 148 Cal.App.2d 211, 218–219, 306 P.2d 955, 960. For other cases see Notes 56 to 59, infra.

56. West v. Smith, 1878, 101 U.S. 263, 273, 25 L.Ed. 809.

"separated from the offer and convey the idea which was in the writer's mind." [57]

A concise statement of the two facets of the rule is contained in an opinion of the Court of Appeals for the Third Circuit:

"While facts assumed to be true for the purpose of compromise are ordinarily not competent as admissions against interest, a distinct admission of a fact will not be summarily excluded simply because it was made in connection with an effort to compromise. It is the offer to do something in furtherance of compromise which is deemed not to be admissible." [58]

The statutory provision which allows the Tax Court to establish its own rules of practice and procedure provides that the proceedings shall be conducted "in accordance with the rules of evidence applicable in trials without a jury in the United States District Court of the District of Columbia." [59]

And the Municipal Court of Appeals for the District of Columbia has held that an unconditional admission may be received in evidence.

The question arose on an appeal from a judgment for damages to an automobile left at the defendant's service station for work on it. The attorney for the plaintiff had testified that after the institution of the action the manager of the station, a Mr. Payne, called by telephone and stated that he had been served with process, that he realized that the defendant was liable and that he "wished to save some money if possible". He inquired if there was

---

**57.** Home Insurance Company v. Baltimore Warehouse Company, 1876, 93 U.S. 527, 548, 23 L.Ed. 868. A similar situation arose in a case decided by Chief Judge Charles N. Pray of the District Court of Montana, wherein speaking of the inability to separate any admission from the offer of compromise, he wrote:

"In the strict sense of the word there does not appear to have been *any material independent facts disclosed not having some relation to the negotiations for compromise.*" Gamble-Skogmo, Inc. v. McNair Realty Co., D.C.1951, 98 F.Supp. 440, 442.

By adopting Judge Pray's opinion this Court has approved the principle thus expressed. (See, McNair Realty Co. v. Gamble-Skogmo, Inc., 9 Cir., 1952, 193 F.2d 876) The principle is uniformly recognized in the federal courts. See, Southern Railway Company v. Madden, 4 Cir., 1956, 235 F.2d 198, 201, and authorities cited in Notes 53 to 56, supra, and Note 58, infra.

**58.** Cooper v. Brown, 3 Cir., 1942, 126 F. 2d 874, 878. See Nau v. C.I.R., 6 Cir., 1958, 261 F.2d 362, 364–365. This principle has received recognition by this Court. See, Montana Tonopah Mining Co. v. Dunlap, 9 Cir., 1912, 196 F. 612, 617; Alaska Freight Lines v. Harry, 9 Cir., 1955, 220 F.2d 272, 277, 15 Alaska 457. In Albert Hanson Lumber Company, Ltd. v. United States, 1923, 261 U.S.

581, 588–589, 43 S.Ct. 442, 445, 67 L. Ed. 809, the ruling of this Court in Montana Tonopah Mining Co. v. Dunlap, supra, on the admissibility, in an action for services rendered, as an independent *fact, of the statement in a corporate resolution that extra services had been rendered by an officer of a corporation,* was approved. The Supreme Court in the case before it upheld the receipt into evidence, in a condemnation suit, of resolutions adopted by the directors of a corporation while they were negotiating a voluntary sale of the property with the Secretary of War, which stated, among other things, that "it was necessary to take the strip of land" owned by the company for a governmental project. To the argument that the resolutions constituted and tended to prove an attempt to compromise, the court's answer was:

"The resolutions contained a distinct admission of fact that it was necessary to take the strip of land in question. *This admission was made for the purpose of showing the right of the Secretary of War to purchase the property. They were admissible in evidence for that purpose. The judge rightly decided at the trial that the taking was for a public purpose and the government had a right to take.*" 261 U.S. at page 589, 43 S.Ct. at page 445, 67 L.Ed. 809. (Emphasis added.)

**59.** 26 U.S.C. § 7453.

any salvage in the car, and, upon being told that there was a net salvage of $280.-00, reducing the original claim to $1221.-29, agreed to secure a company draft for the full amount then claimed, plus court costs. To the contention that this was error the Court's answer was:

> "An offer made in compromise is not admissible in evidence. McMahon v. Matthews, 48 App.D.C. 303. But it is not always easy to determine whether a statement is made by way of compromise. 4 Wigmore, Evidence, § 1061 (3rd ed.), says that the test is whether the statement is made conditionally or unconditionally; that a conditional concession is not admissible but an unconditional assertion is admissible. *Payne's statement appears to us, as it did to the trial court, to have been an unconditional and unqualified acknowledgment of liability and promise to pay. We hold the testimony was admissible."* [60] (Emphasis added.)

Although, in the course of his testimony, the agent, Marsh, referred to "settlement conferences" and the attorney for the Government used a similar phrase, it is evident, from an examination of the record that the taxpayer's statements referred to were not, *in truth*, made during any offer of compromise. When he was placed on the stand, Mr. Marsh was warned:

> "Q. Now, there were certain items which were discussed in those conferences, Mr. Marsh, which were conceded only for the purposes of settlement and I don't want you to mention any of those items in my questions to you from now on."

That this was done appears in the following colloquy between court, counsel and the witness:

> "The Court: I am not so sure that this first meeting and the early meet-

ings, there was a question of settlement, I presume, and the objective is to find out what this man's income was and to that extent, the conference would possibly produce the man's income.

> "The case is a little bit weakened by all this talk of settlement because I can't quite tell whether some of these were settlement conferences or not.

> "At any rate, I think the government would be the first to want no disclosure of settlement because the government settles many of these cases and if every witness knew that he would have to face any admission that he made in a settlement conference in court, that it would be used against, of course, the government would be in a bad way in a lot of these settlements and a lot of these cases.

> "I think we will let the ruling stand and the evidence will be admitted. I do think it hasn't been made very clear with respect to how much of this was settlement and how much of it was a legitimate inquiry as to the proper income that this man owed.

> "Q. (By Mr. Donoghue): *In your testimony on direct examination did you list any items which Mr. Factor had conceded only for purposes of settlement?* A. No compromise items. There are a number of compromise items which he wasn't able to explain and for settlement we just agreed to split them fifty-fifty.

> "Q. *I don't want to know anything about those items.* A. *But in my testimony I didn't mention them.*

> "Q. You only testified about items that Mr. Factor said what about? What were his own words

---

60. Firestone Tire and Rubber Co. v. Hillow, 1949, D.C.Mun.App., 65 A.2d 338, 339–340. This ruling is of special significance because the same Court, in a later case, after referring to the case just cited, held that "an offer to settle or compromise is not admissible against the party making it." Harrison v. District of Columbia, D.C.Mun.App., 1953, 95 A.2d 332, 334.

about the items? A. It was either 'That's mine,' or 'That was for me,' or 'That's okay,' or 'I'll agree on that,' or words to that effect, but I can't say what he specifically said with respect to any.

"There are so many items. He may have said 'That's okay,' and 'That's okay'." (Emphasis added.)

■■■ It is quite clear that the agent *did not* testify to any admissions made by way of compromise. He so stated emphatically. More, the opinion of the Tax Court nowhere refers to any of the testimony given by him.

Despite the use of the term "settlement meetings" by counsel in the case, there is nothing in the record to indicate that, at any time during these conferences, the taxpayer made an offer to pay any amount, conditioned upon a denial of liability, *which is essential to a true offer of compromise*. Nor does the record of the conferences, as testified to in court, disclose any "compromise" items conceded by the taxpayer. When certain items were shown to him, as to which the proof was such that he could not deny them, he admitted them.

Indeed, as already appears, the agent summed up his testimony by saying that all he could remember was that, as to certain items, the taxpayer admitted "that is mine" or "that is for me" or "that is okay" or "I'll agree on that".

Several meetings were held. The taxpayer attended two only. One of the taxpayer's attorneys in this case, Mr. Jack B. Rubin, called as a witness, testified that all the meetings

"were for purposes of working out a settlement of the case."

This fact and the fact that in the argument before the Tax Court or in their brief, counsel for the Commissioner may have referred to these conferences as aiming at settlement do not prevent the assertion by the Commissioner in this Court that, in reality, they were made as independent admissions of fact.

We are of the view that whatever testimony was admitted comes within the exception to the rule which bars offers of compromise or admissions made in view of compromise and during the negotiations leading towards it. The Tax Court was right in its ruling on the subject.

## VIII

### Fraud

■■■■ In evaluating the facts before the Tax Court, reference should be had to the fact that the Commissioner determined additions to tax in the taxable years before us under the statutory provision which makes a fifty per cent addition by the Commissioner mandatory, if

"any part of any deficiency is due to fraud with intent to evade." [61]

The Tax Court sustained the Commissioner in these words:

"We are convinced from the entire record that the purpose for concealing receipt of such income was to wilfully evade the tax. We therefore hold that some part of the deficiency in each of the years before us is due to fraud with intent to evade tax."

The taxpayer states in his brief before this Court that he

"does not claim that the imposition of these penalties is clearly erroneous."

However, the Commissioner, *having met the heavy burden which such a finding entails*, is entitled to have the fact considered by us, in meeting the Tax Court's challenged determinations. Rightly so. For the fraud found in the case permeates all the transactions of the taxpayer. So a brief comment on the subject is appropriate.

The burden of proving fraud is on the Commissioner.[62] The rule of this Circuit

---

61. 1934 Rev.Act, § 293(b), 26 U.S.C.A. Int.Rev.Acts, p. 751; 1936 Rev.Act, § 293(b), 26 U.S.C.A. Int.Rev.Acts, p. 921.

62. Katz v. C.I.R., supra Note 41, 188 F. 2d at page 958.

is that the evidence in proof of fraud must be clear and convincing.[63] This correctly carries into effect the mandate of the statute.[64]

The Supreme Court has given among the badges of fraud the following:

> "Concealment of assets or covering up sources of income, handling of one's affairs to avoid making the records usual in transactions of the kind, and any conduct, the likely effect of which would be to mislead or to conceal." [65]

Gross understatement of income may be the basis for a finding of fraud.[66] Here there was deliberate concealment of income for the taxable years. For the year 1935 the taxpayer, under oath, stated that he derived no income that year. His statement in 1936, as shown by the facts, glaringly concealed income.

No books were kept as to the Canadian transactions. No tax returns were made in Canada. No books were kept by the taxpayer, Montray or Nevens.

Nevens were "outside brokers". As they were not members of the London Stock Exchange, they could not deal in securities themselves, but dealt through "inside brokers", members of the Exchange, with whom they divided the commissions.

Like the Tax Court, we are not impressed by the statement of the taxpayer that he disguised his Canadian transactions because he had been kidnapped by the underworld and did not wish any one to know that he was affluent. The speciousness of the claimed justification is apparent. During the taxable years the taxpayer was a resident of California. We have the right to indulge in the presumption that he would have been given police protection agaist any threats to injure his person or property. On the whole, it is quite evident that the Canadian transactions and the "coverup" and concealment of the taxpayer's other activities during the two taxable years were motivated by a craven desire to avoid just taxation. This is the essence of wilful fraud.

The Tax Court's rejection of the taxpayer's claimed deductions must be considered in the light of the facts which spelled out this fraud.

## Conclusion

The courts, in interpreting income tax laws, have stated that the intention of the Congress in defining gross income [67] was

> "to tax all gains except those specifically exempted." [68]

In determining what income is taxable the courts

> "have not allowed the form to obscure the reality." [69]

On the contrary, they have taxed the income in the hands of him who controlled it. This for the reason that

> "taxation is not so much concerned with the refinements of title as it is with actual command over the property taxed—the actual benefit for which the tax is paid. If a man directed his bank to pay over income as received to a servant or friend, until further order, no one would doubt

63. Clark v. C.I.R., supra Note 17, 266 F. 2d at pages 717–718.

64. 1934 Rev.Act, § 293(b); 1936 Rev.Act, § 293(b).

65. Spies v. United States, 1943, 317 U.S. 492, 499, 63 S.Ct. 364, 368, 87 L.Ed. 418.

66. Helvering v. Kehoe, 1940, 309 U.S. 277, 279, 60 S.Ct. 549, 84 L.Ed. 751; Clark v. C.I.R., supra Note 17, 266 F.2d at pages 717–718.

67. 1934 Rev.Act, § 22(a), 26 U.S.C.A. Int.Rev.Acts, page 669. 1936 Rev.Act, § 22(a), 26 U.S.C.A. Int.Rev.Acts, page 825.

68. C.I.R. v. Glenshaw Glass Co., 1955, 348 U.S. 426, 428, 75 S.Ct. 473, 476, 99 L.Ed. 483.

69. Harrison v. Schaffner, 1941, 312 U.S. 579, 583, 61 S.Ct. 759, 762, 85 L.Ed. 1055.

that he could be taxed upon the amounts so paid." [70]

In dealing with the tax incidence of particular transactions, courts have disregarded form. They have concerned themselves with the ultimate effect of the transactions. The reason given by the Supreme Court is:

"Their forms do not control. Their essence is determined not by subtleties of draftsmanship but by their total effect." [71]

In the case before us we have a resident alien who admits serving a term in a federal penitentiary for an offense not connected with the tax matter in controversy,[72] who deliberately, during the taxable years concealed his income and its sources. Instead, he chose to do business through various persons and organizations whose activities he controlled entirely.

Through the organization in Canada of two gold mining stock companies, the activities of which he controlled, stocks were acquired and issued for sale in England through an organization which he also controlled, whose various salesmen he sent to England and some of whom he kept on his payroll after the activities ended and they returned to the United States. Much money was collected from the English investors. Some of it went into the operation of mining properties, a large portion of it went, directly and indirectly, to the taxpayer and to his salesmen and agents engaged in the stock promotion operation. The taxpayer, the agents through whom he operated, kept no books or records at all, or inadequate ones. Such fragmentary records of their transactions as were available were secured by the Commissioner through the Canadian and English authorities and Canadian, American and English banking and business establishments with whom they dealt. We feel that the members of the Commissioner's staff had an onerous task in attempting to reconstruct the income.

If, because there is absent documentary evidence to substantiate certain transactions, the taxpayer was at a disadvantage, the situation was of his own making.[73] A thorough examination of the extended record in this case, which we have summarized and from which we have quoted extensively in the body of the opinion, leads to the conclusion that the findings of the Tax Court, insofar as they are questions of fact, are not "clearly erroneous",[74] and that the Tax Court did not err in the application of the law to specific facts.

The decision of the Tax Court is, therefore, affirmed.

70. Corliss v. Bowers, 1930, 281 U.S. 376, 378, 50 S.Ct. 336, 74 L.Ed. 916.

71. C.I.R. v. P. G. Lake, Inc., 1958, 356 U.S. 260, 266–267, 78 S.Ct. 691, 695, 2 L.Ed.2d 743. C.I.R. v. Sunnen, 1948, 333 U.S. 591, 608–610, 68 S.Ct. 715, 92 L.Ed. 898.

72. Presumably, a felony, 18 U.S.C. § 1(1).

73. If, like Molière's famous character, George Dandin, the taxpayer were philosophical, he could say to himself "Vous l'avez voulu, vous l'avez voulu, George Dandin, vous avez justement, ce que vous méritez" (You have willed it, willed it, George Dandin, You got what you deserved) (Molière, George Dandin, Act I, Sc. VII, in Oeuvres de Molière, Les Grands Ecrivains de la France, vol. VI, p. 538, ed. Hachette, 1922) The taxpayer may have realized this for, at the trial, in answer to a question by the attorney for the Commissioner, he stated: "If I had kept records, Mr. Donoghue, we wouldn't all be here."

74. Rule 52(a), Federal Rules of Civil Procedure.