T.C. Memo. 2001-42

UNITED STATES TAX COURT

A.J. CONCRETE PUMPING, INC., Petitioner $\underline{v}$.
COMMISSIONER OF INTERNAL REVENUE, Respondent

Docket No. 20217-98.                    Filed February 23, 2001.

James L. McDonald, Sr., for petitioner.

Larry D. Anderson, for respondent.

MEMORANDUM OPINION

GERBER, Judge:  Respondent determined deficiencies in
petitioner's Federal income tax and section 6662[1] accuracy-
related penalties as follows:

_____

[1] Unless otherwise indicated, all section references are to
the Internal Revenue Code in effect for the taxable periods under
consideration, and all Rule references are to the Tax Court Rules
of Practice and Procedure.

|                | | Penalty |
| TYE | Deficiency | Sec. 6662(a) |
| --- | --- | --- |
| Mar. 31, 1992 | $201,698 | $40,340 |
| Mar. 31, 1994 | 59,524 | 11,905 |

After concessions,[2] the issues remaining for our consideration are:  (1) Whether petitioner understated its 1992 and 1993 gross receipts by $56,787 and $74,046,[3] respectively; (2) whether petitioner had unreported equipment rental income from Olympic Concrete Pumping, Inc. (Olympic), in 1992 of $62,789; (3) whether petitioner had installment sale gains in 1993 and 1994 of $31,500 and $53,602, respectively, from the disposition of equipment that purportedly had been leased; (4) whether petitioner had unreported income in 1992 of $88,893 from an equipment sale arranged by Olympic; (5) whether petitioner overstated its beginning inventory for 1992 by $61,066; (6)

---

[2] The parties agree that for the Mar. 31, 1992, tax year: (1) Petitioner is entitled to an additional $57,182 depreciation allowance; (2) petitioner is not entitled to deduct the $3,748 interest disallowed; and (3) petitioner is not entitled to deduct the $10,247 tax expense disallowed.  The parties agree that for the Mar. 31, 1993, tax year:  (1) Petitioner is not entitled to deduct the $12,256 bad debt expense disallowed; (2) petitioner is not entitled to deduct the $39,110 depreciation expense disallowed; and (3) petitioner is not entitled to deduct the $3,748 interest expense disallowed.  The parties agree that for the Mar. 31, 1994, tax year petitioner is entitled to an additional $65,340 depreciation allowance.

[3] The 1993 tax year in which a loss was reported was not the subject of a deficiency determination.  Instead, respondent adjusted various items that had the effect of reducing the net operating loss carryover to the 1994 year.  One of those adjustments was based on the bank deposits analysis resulting in the determination of the $74,046 increase to gross receipts.

whether petitioner expensed a $22,250 capital asset in 1992 that it also was depreciating; (7) whether petitioner is entitled to a miscellaneous deduction in 1992 of $11,997; (8) whether petitioner is entitled to auto and truck expense deductions in 1992, 1993, and 1994 of $3,794, $6,177, and $5,925, respectively; (9) whether petitioner is entitled to depreciation deductions connected with the personal use of automobiles in 1992, 1993, and 1994 of $1,590, $9,623, and $594, respectively; (10) whether petitioner is entitled to the following expenses in 1992 paid for the benefit of Olympic:  Purchases--$6,128; fuel--$13,233; legal fees--$10,931; travel--$11,412; (11) whether petitioner overstated its insurance expenses for 1992, 1993, and 1994 by $3,191, $1,401, and $1,401, respectively; (12) whether petitioner overstated its 1992 repair expenses by $1,543; (13) whether petitioner is entitled to a $64,291 investment tax carryover from 1991 to 1992; (14) whether petitioner is entitled to a $196 jobs credit carryover from 1991 to 1992; and (15) whether petitioner is liable for the accuracy-related penalty under section 6662 for 1992 and 1994 in the amounts of $40,340 and $11,905, respectively.

Background[4]

Petitioner's principal place of business at the time of the filing of the petition in this case was Mableton, Georgia. Petitioner, a subchapter C corporation, is a general contractor engaged in the business of pumping concrete. During the 1992, 1993, and 1994 tax years, Alan Bone (Bone) and Jeffrey Guerrero (Guerrero) owned 51 percent and 49 percent, respectively, of its common stock.

Understatement of Gross Receipts

Findings of Fact

Respondent conducted an examination of petitioner's 1992 through 1994 tax years. In connection with an analysis of petitioner's reported receipts for the 1992 through 1994 tax years, respondent's agent, Ronald Harkins (Agent Harkins), performed bank deposits analyses of petitioner. For 1992, Agent Harkins received the analysis that petitioner prepared for the purpose of assisting him during the examination. Petitioner's analysis reflected the items that petitioner had included in gross receipts. On the basis of that analysis of petitioner's bank deposits for the 1992 tax year, Agent Harkins concluded that

_____

[4] The parties' stipulated facts and exhibits are incorporated herein by this reference. Because this case involves numerous adjustments and/or issues for our consideration, we have found general facts under the title "Background", and facts specific to each issue are found separately within the separately captioned sections of the opinion considering each specific adjustment or issue.

petitioner had omitted certain specific items of income.  In particular, it appeared that a deposit of $39,500 received from McDevitt & Street and deposits totaling $17,287 received from Floyd & Lloyd Rentals[5] had not been included in gross receipts. In response to Agent Harkins' findings, petitioner advised that the amounts were included in rent and other income, categories reported separately from the gross receipts on petitioner's 1992 corporate return.  Agent Harkins analyzed those specific return items, compared them to petitioner's financial records, and found that the amounts reported in the rent and other income categories did not include the $39,500 and $17,287 amounts.  Agent Harkins did not check any other of petitioner's accounts or records to determine whether the analysis received from petitioner was, in other respects, correct.

For purposes of trial, petitioner prepared another analysis of the bank deposits for the 1992 tax year that purported to contain a reconciliation of the bank deposits and the amounts reported on the 1992 corporate tax return.  That analysis, in an attempt to account for the $39,500 and $17,287 amounts, contained numerous unexplained adjustments used to effect the reconciliation.  The analysis presented for purposes of trial did

---

[5] Several exhibits contained in the record refer to this entity as "Ford and Lloyd".  Petitioner, however, refers to it as "Floyd and Lloyd".  For consistency, we refer to it as "Floyd and Lloyd".

not show that respondent's analysis of petitioner's accounts for rent and other income was in error.

On the basis of a bank deposits analysis for the 1993 tax year (without the designation of any specific items of income), respondent determined that petitioner had understated 1993 gross receipts by $74,046. Likewise, for the 1994 tax year, respondent used a generalized bank deposits analysis to conclude that petitioner had overreported its income by $66,737. Petitioner does not dispute the 1994 adjustment reducing its gross receipts. With respect to respondent's 1993 bank deposits analysis, petitioner provided its own analysis in an attempt to show that its gross receipts were overreported for its 1993 taxable year. Petitioner's analysis contained a reconciliation of its 1993 deposits to the income amount reported on its 1993 corporate return. Petitioner's reconciliation reflected reductions from total deposits of amounts that were not includable in gross receipts, such as proceeds of loans from Merrill Lynch and other similar items. Respondent did not present any evidence regarding the methodology used in conducting the 1993 bank deposits analysis or contradicting the items petitioner explained were from nontaxable sources.

Discussion

Taxpayers are required to maintain adequate records of taxable income. See sec. 6001. During the examination of

petitioner's 1992 income tax return, Agent Harkins performed a bank deposits analysis, in which he determined that specific deposits reflected in petitioner's financial records had not been reported in 1992 gross receipts on the corporate return. In addition, respondent performed bank deposits analyses for 1993 and 1994 generally reflecting that gross receipts had been either underreported or overreported.

In cases where taxpayers have not maintained business records or where their business records are inadequate, the Commissioner is authorized to reconstruct income by any method that, in the Commissioner's opinion, clearly reflects income. See sec. 446(b); Parks v. Commissioner, 94 T.C. 654, 658 (1990). The Commissioner's method need not be exact but must be reasonable. See Holland v. United States, 348 U.S. 121 (1954).

The bank deposits method for computing unreported income has long been sanctioned by the courts. See Factor v. Commissioner, 281 F.2d 100, 116 (9th Cir. 1960), affg. T.C. Memo. 1958-94; DiLeo v. Commissioner, 96 T.C. 858, 867 (1991), affd. 959 F.2d 16 (2d Cir. 1992). Bank deposits are prima facie evidence of income. See Tokarski v. Commissioner, 87 T.C. 74, 77 (1986). Where the taxpayer has failed to maintain adequate records as to the amount and source of his or her income and the Commissioner has determined that the deposits are income, the taxpayer must

show that the determination is incorrect.  See Rule 142(a); Welch v. Helvering, 290 U.S. 111, 115 (1933).

In calculating petitioner's 1992 income using the bank deposits method, Agent Harkins found several items that were not reported on petitioner's income tax return.  In particular, it was determined that deposits from McDevitt & Street totaling $39,500 and deposits from Floyd & Lloyd totaling $17,287 were not reported as income.  Petitioner admits receiving the income and contends that the income from McDevitt & Street was included in "Other Income" on its tax return, and the income from Floyd & Lloyd was included in "Rental Income" on its tax return.

Respondent, however, reviewed petitioner's "Other Income" and "Rental Income" accounts and determined that the income from McDevitt & Street and Floyd & Lloyd was not included in any of those accounts.  Accordingly, respondent has specifically identified items of income that were not included on petitioner's 1992 corporate tax return.  Petitioner, at trial, introduced a new analysis of deposits in an attempt to show that the questioned 1992 income items were reported and that petitioner's reported 1992 income was overstated by a few thousand dollars. The 1992 schedule presented by petitioner at trial was not the same schedule that had been presented to Agent Harkins during the audit examination, and it did not reconcile to petitioner's books of account.  Petitioner's analysis presented at trial,

accordingly, did not deal with Agent Harkins' analysis of petitioner's financial records to verify that the schedule provided by petitioner during the examination was correct. Finally, petitioner did not explain the differences between the two schedules. Accordingly, respondent's determination was based on verified and uncontradicted specific items of income that were omitted from petitioner's 1992 income, and respondent's determination of understatement of gross receipts for 1992 is sustained.

Respondent also determined that petitioner understated its gross receipts by $74,046 for the 1993 year. The statutory notice of deficiency contains a net reduction of $59,177 to petitioner's claimed 1993 net operating loss, thereby reducing the amount of any carryover to the 1994 year from the $231,441 claimed to $172,264. The $59,177 net adjustment comprises 10 items decreasing and one item increasing the 1993 net operating loss. Our trial record and the notice of deficiency contain no details or explanations of the $74,046 proposed understatement of gross receipts for 1993, and the amount is apparently the result of a general bank deposits analysis by Agent Harkins.

Unlike the specific adjustments for 1992, respondent's adjustment for 1993 is based on generalized bank deposits. Petitioner addresses respondent's determination on that item by reconciling the total bank deposits to the items on its return in

an attempt to show omissions and errors in respondent's reconstruction for 1993. In that regard, the Commissioner's income reconstructions are subject to taxpayers' showing computation errors and omissions and/or errors in the Commissioner's methodology. See Webb v. Commissioner, 394 F.2d 366, 372-373 (5th Cir. 1968), affg. T.C. Memo. 1966-81. Petitioner's reconciliation, in great part, depends upon nontaxable loan receipts in a total amount exceeding $466,000, along with other nontaxable items that petitioner subtracted from total deposits to arrive at reportable income. Respondent has not countered petitioner's showing of nontaxable items that would reduce the total bank deposits to arrive at reportable income for the 1993 year.

Accordingly, petitioner has shown that respondent's approach to reconstructing its 1993 gross receipts is flawed. We are unable to draw any conclusion, as respondent apparently wishes us to do, from the fact that we have found that petitioner understated 1992 income. That is so because respondent's approach for 1992 was to identify specific items of omitted income. Accordingly, we find that petitioner did not understate its 1993 income by $74,046 as determined by respondent.

Understatement of Equipment Rental Income

Findings of Fact

On March 15, 1990, Bone and Guerrero formed a new S corporation, Olympic, to operate a business project in Washington State.  In 1992, Guerrero owned 51 percent of Olympic's common stock and Bone owned the remaining 49 percent.  Bone and Guerrero each contributed $500 to Olympic, arranged for Olympic to lease concrete pumping trucks, and permitted Olympic to borrow capital from petitioner.  During the period under consideration, Olympic made repayments to petitioner.  During its existence, Olympic leased trucks and concrete pumping equipment from petitioner for use in Olympic's business.  Olympic discontinued business in 1992.

Olympic, pursuant to the lease with petitioner, was obligated to pay an $11,681.41 monthly rental for use of the equipment.  Olympic paid petitioner $190,415.89 during the fiscal year ending March 31, 1992.  Of the $190,415.89, petitioner reported $64,839 as rental proceeds on its 1992 tax return.  Of the remaining $125,576 in payments, petitioner contends that they should be treated as nontaxable payments on a loan.  Respondent, however, has allowed only one-half of the $125,576, or $62,788, to be treated as a loan repayment from Olympic to petitioner, and respondent treated the other one-half as additional lease

payments or income to petitioner. Conversely, respondent allowed Olympic an additional $62,788.89 deduction.

Discussion

Rents are includable in gross income. See sec. 61(a)(5). Respondent determined that during 1992 petitioner received more rental income than it reported. An analysis of petitioner's deposits reflected that various payments were made from Olympic to petitioner. These amounts represented both loan repayments and equipment rental payments. Petitioner admits that Olympic rented petitioner's pumping equipment but alleges that all of the $125,576 in deposits to its account from Olympic represented loan repayments of principal, which are not includable in income. Further, the lease agreement between petitioner and Olympic called for monthly rental payments of $11,681.41, or $140,176.92 annually. The schedule of payments from Olympic to petitioner reflects that the total monthly payments approximated the $11,681.41 monthly amount called for in the lease. Combining the $64,839 reported by petitioner and the $62,789 determined by respondent would result in petitioner's reporting $127,627, or $12,549.92 less than the $140,176.92 called for by the terms of the lease. Petitioner contends that respondent's determination is arbitrary but has offered no evidence that would show that it is in error.

The record indicates that Olympic made $190,415.89 in payments to petitioner during the fiscal year ending March 31, 1992. Only $64,839, however, was reported as rental proceeds on petitioner's 1992 income tax return. Petitioner has failed to show that the deposits in question from Olympic were loan repayments rather than rental payments. Accordingly, respondent's determination regarding the unreported rental income of $62,789[6] for the 1992 tax year is sustained.

Sale vs. Lease

Findings of Fact

During the years at issue, petitioner entered into lease arrangements under which various parties were permitted the use of petitioner's concrete pumping equipment. Each of these arrangements required monthly payments to petitioner for a specific period of as little as 36 months to as long as 60 months, depending upon the arrangement. Under the agreements, the "lessee" bore the burden of all expenses for necessary repairs, maintenance, operation, and replacements required to be made to maintain the equipment in good condition. The "lessee" was also required to maintain insurance on the equipment. Each

---

[6] At trial, respondent asserted that a $125,577 adjustment for a rental income understatement could have been determined. Respondent, however, determined that only 50 percent of the $125,577 difference would be rental income and the remaining 50 percent loan repayment. Respondent's determination was apparently based on some prior agreement or understanding with petitioner.

agreement contained the stipulation that, upon the expiration of the lease, the lessee had the option to purchase the equipment for $1.

Discussion

We must consider whether the lease arrangements executed during the years in issue constituted sales or whether they were leases with an option to buy.  Respondent argues that petitioner mischaracterized the lease agreements by reporting the related items as though the agreements were leases instead of sales; i.e., reporting as income only the monthly payments rather than reporting all the sale proceeds at the front end of the transaction.  Respondent determined that the arrangements were, in substance, installment sales and that petitioner had unreported gains of $31,500 and $53,602 for 1992 and 1994, respectively.  Petitioner contends that it properly characterized and reported the transactions as leases with an option to buy.

Whether a sale is complete for Federal tax purposes depends on all of the facts and circumstances.  See Derr v. Commissioner, 77 T.C. 708, 724 (1981).  We consider the following factors in deciding whether a sale has occurred:  (1) Whether the seller transferred legal title; (2) whether the benefits and burdens of ownership passed to the buyer; (3) whether the owner had a right under the agreement to require the other party to buy the property; and (4) how the parties treated the transaction.  See

Grodt & McKay Realty, Inc. v. Commissioner, 77 T.C. 1221, 1237-1238 (1981).

Each lessee entered into an agreement in which the lessee would make payments covering a period ranging from 36 months to 60 months, depending on the agreement. At trial, however, petitioner admitted that most of the payments for the leases were received in a single or lump-sum payment. The agreements also provided that the lessee had the option of purchasing the equipment for $1 by giving the lessor 30 days' notice before the expiration of the lease. The agreements also required the lessee to pay the expense of all repairs on the equipment and maintain insurance for the equipment.

Petitioner argues that the transaction was treated consistently as a lease for tax purposes. The test, however, does not center on the labels given to a transaction, but, rather, the intent of the parties should be examined from the viewpoint of what they intended to happen. See Oesterreich v. Commissioner, 226 F.2d 798, 801 (9th Cir. 1955). The fact that the purported lessees bore the burden of expenses for repairs, insurance, and maintenance and could acquire the property at the end of the lease term for a $1 option is a strong indication that, regardless of the labels, the parties intended these transactions to be a sale of the equipment. See Kwiat v.

Commissioner, T.C. Memo. 1989-382; Van Valkenburgh v.
Commissioner, T.C. Memo. 1967-162.

Considering all the facts, we conclude that it was unlikely
that the $1 option would remain unexercised at the end of the
term.  Furthermore, while there is no indication that title
actually passed to the lessees during the term of the lease, the
lessees bore the burdens and benefits of ownership.  Therefore,
the lease agreements substantially shifted the benefits and
burdens of ownership from petitioner to the lessees and
constitute sales for tax purposes.  Accordingly, respondent's
position on this issue is sustained.

Unreported Gain on Sale of Assets

Findings of Fact

On March 6, 1992, Olympic sold property leased from
petitioner to Ralph's Concrete and Vance Gribble.  In exchange
for the property, Olympic received cash proceeds of $440,121.
Olympic remitted $216,395 of the $440,121 to petitioner and
retained $223,726.  On its March 31, 1992, tax return, petitioner
reported a $227,061 gain from the sale of these assets.  Both
parties agree that petitioner incorrectly computed the gain from
the sale of these assets.  The correct gain is $315,954.

Discussion

On March 6, 1992, Olympic sold various pieces of pumping
equipment that were owned by petitioner.  On its 1992 tax return,

petitioner reported a $227,061 gain from this sale. The parties agree that petitioner miscalculated the gain from the disposition of the property, and the amount in the notice of deficiency is correct. Petitioner, however, now contends that Olympic was the true owner of this property, and the gain from the sale of the equipment should be reported by Olympic and not petitioner.

Petitioner's contention, however, is wholly unsupported in the record. At trial, Mr. Bone, petitioner's 51-percent owner, in response to the question of who owned the equipment, replied that petitioner owned it. Petitioner also failed to present any evidence regarding the agreement between petitioner and Olympic with respect to the equipment under consideration. Consistent with respondent's determination and petitioner's reporting of the transaction is the fact that Olympic's 1991 and 1992 tax returns included $125,816 and $146,847, respectively, in equipment lease deductions. Olympic's reporting of lease payments supports our holding here that the arrangement between petitioner and Olympic was a lease. Accordingly, respondent's determination regarding the gain on the sale of equipment is sustained.

Overstatement of Inventory

### Findings of Fact

Petitioner listed its 1991 ending inventory as $30,602. Petitioner listed its 1992 beginning inventory as $91,668. The difference is attributable to Olympic's 1992 discontinuation of

its business and petitioner's receipt of Olympic's repair parts worth approximately $61,000.

Discussion

Respondent determined that petitioner overstated its 1992 beginning inventory by $61,066. In computing a taxpayer's gross income, cost of goods sold is an offset or reduction from gross receipts in determining income. See sec. 1.61-3(a), Income Tax Regs. Cost of goods sold is determined by adding purchases to the beginning inventory and subtracting the ending inventory. The method for computing cost of goods sold is mechanical.

Petitioner argued that the $61,066 change in beginning inventory was the result of its receiving additional available repair parts from Olympic, which discontinued business operations. Petitioner, however, failed to explain why it treated repair parts as inventory. Petitioner's primary business was providing a service (transporting concrete and leasing equipment). The leases to third parties, other than Olympic, were effectively sales where the lessees/purchasers took care of their own repairs. With respect to the lease to Olympic, the repair parts were not shown to have been purchased or maintained as inventory by petitioner. Substantially, petitioner was in a service industry, and it is unclear why petitioner would regard repair parts as inventory. That is so regardless of whether

those repair parts were given to petitioner without consideration or in the form of a loan repayment.

Petitioner has not shown that the repair parts were merchandise held for sale to customers in the normal course of its business. Accordingly, respondent's determination that petitioner's 1992 beginning inventory was overstated is sustained.

## Expense Items

### A. Findings of Fact

### 1. Equipment Purchase

During 1991, petitioner purchased equipment from Traylor Brothers for $22,250 and deducted the cost of the equipment on its 1992 tax return. Respondent determined that petitioner was not entitled to expense the cost of equipment but that the cost should be capitalized and depreciated.[7]

### 2. Miscellaneous Expense

For its 1992 tax year, petitioner claimed a deduction for miscellaneous expense items in the total amount of $15,204. Respondent determined that petitioner failed to establish that the entire amount was for ordinary and necessary business expenses, disallowing $11,997 of the $15,204 claimed deduction.

---

[7] Petitioner claimed depreciation in the amount of $3,214.29. Respondent, however, determined that the correct depreciation deduction should have been $4,500.16 and made the necessary upward adjustment.

### 3. Automobile and Truck Expense

Petitioner also claimed automobile and truck expenses in 1992, 1993, and 1994 of $32,456, $60,550, and $58,082, respectively. Respondent determined that petitioner is not entitled to automobile and truck expenses in 1992, 1993, and 1994 of $3,794, $6,177, and $5,925, respectively, and disallowed those amounts.

### 4. Depreciation on Personal Use Automobiles

Petitioner claimed depreciation deductions in connection with automobiles its shareholders personally used for 1992, 1993, and 1994 of $1,590, $9,623, and $594, respectively. On the basis of the nature of and facts surrounding petitioner's business, respondent allowed 50 percent of the depreciation amounts claimed by petitioner on the automobiles.

### 5. Olympic's Expenses Paid by Petitioner

Petitioner claimed deductions in the 1992 tax year for expenses paid on behalf of Olympic. These expenses included purchases of $6,128, fuel expenses of $13,233, legal fees of $10,931, and travel expenses of $11,412. Respondent determined that petitioner is not entitled to deduct these expenses.

6.  Insurance Expenses

Petitioner deducted expenses for insurance in 1992 and 1994 in the amounts of $147,253[8] and $66,876, respectively. Respondent determined that petitioner is not entitled to deduct $3,191 in 1992 and $1,401 in both 1993 and 1994 and disallowed those amounts.

7.  Repair Expenses

Petitioner deducted repair expenses for 1992 in the amount of $2,825.  Respondent determined that petitioner is not entitled to deduct $1,543 and disallowed that amount.

B.  Discussion

1.  Equipment Expense

Petitioner deducted, as equipment expenses, $22,250 that had been paid for equipment purchased in 1992.  Respondent disallowed the $22,250 deduction after it was determined that the purchased equipment had been included on petitioner's return as a fixed asset and depreciation expense claimed in addition to the $22,250 deduction.  After examining the fixed asset schedule, respondent's agent concluded that the equipment should have been capitalized rather than expensed.

---

[8] In the notice of deficiency, respondent determined that petitioner deducted $147,253 for insurance expenses in 1992. Petitioner's tax return, however, reflects claimed insurance expense of $130,213.

Petitioner presented documentation regarding the purchase of the equipment but did not explain why the cost of the asset was deducted as an expense and also capitalized and depreciated. Petitioner's sole statement in its brief regarding this issue is as follows: "A.J. Concrete Pumping, Inc. purchased used inoperative equipment in the amount of $22,250 from the Bellamy Brothers, Inc., so as to 'cannibalize' it for spare parts not readily available in the open market." We find this uncorroborated statement to be, by itself, unhelpful and unpersuasive. Accordingly, respondent's disallowance of the $22,250 deduction is sustained.

2. <u>Miscellaneous Deduction</u>

Petitioner deducted $15,204 for miscellaneous costs on its 1992 tax return. Respondent disallowed $11,997 of this amount, and petitioner did not present any evidence supporting this deduction. On brief, petitioner's sole argument regarding this issue is that respondent is taking a "convenient position" that this expense belongs to Olympic and not petitioner, and borders on being a "whipsaw proposed adjustment". Regardless of petitioner's opinion about respondent's proposed adjustments, petitioner has failed to present any evidence substantiating its entitlement to the "miscellaneous deduction". Accordingly, respondent's determination on this item is sustained.

3.  Automobile Expenses

Respondent disallowed automobile and truck expenses for the 1992, 1993, and 1994 tax years of $3,794, $6,177, and $5,925, respectively.  Respondent disallowed the above-listed amounts because of petitioner's failure to substantiate that the amounts were expended for business use of automobiles and trucks. Petitioner did not offer any evidence at trial or present any argument on brief regarding these amounts.  Accordingly, respondent's determination on these items is sustained.

4.  Depreciation Deductions

For the 1992 and 1993 tax years, petitioner depreciated the full cost of vehicles used by shareholders Bone and Guerrero without taking into consideration their personal use of the vehicles.  Petitioner attempted to justify the full amount of depreciation it claimed on the grounds that the vehicles were required to be available on call 24 hours a day.

Section 167 allows a deduction for the depreciation of business equipment used in the course of a business or trade. Section 280F, however, reduces the amount of depreciation that can be claimed for passenger automobiles.  Specifically, section 280F limits the allowable amount of depreciation to a multiple equal to the percentage of actual business use.  See sec. 1.280F-2T(i), Temporary Income Tax Regs., 49 Fed. Reg. 42707 (Oct. 24, 1984).

Additionally, section 274(d) requires, in the case of claimed deductions for business use of passenger automobiles, that taxpayers substantiate the amount of business use. In order to substantiate a deduction attributable to listed property, a taxpayer must maintain adequate records to show the amount of the expense, the time and place of use, and the business purpose for the use. See, e.g., <u>Whalley v. Commissioner</u>, T.C. Memo. 1996-533. To substantiate a deduction by means of adequate records, a taxpayer must maintain an account book, a log, a statement of expense, or trip sheets to establish the element of use. See sec. 1.274-5T(c)(2)(i), Temporary Income Tax Regs., 50 Fed. Reg. 46017 (Nov. 6, 1985).

Petitioner did not produce any records concerning personal versus business use of the vehicles. Respondent allowed petitioner 50 percent of the claimed depreciation on the basis of oral testimony during the audit examination and the nature of and facts surrounding petitioner's business. At trial, petitioner presented no evidence other than uncorroborated and undocumented oral testimony. Accordingly, respondent's determination on this issue is sustained.

5. <u>Olympic's Expenses Paid by Petitioner</u>

Petitioner claimed several deductions in its 1992 tax year for expenses that were paid on behalf of Olympic. These deductions included $10,931 for legal expenses, $6,128 for

machine parts, $13,233 for fuel costs, and $11,412 for traveling expenses. Petitioner claimed that the amounts paid on behalf of Olympic were petitioner's ordinary and necessary business deductions.

Whether a corporation may deduct the expenses it pays for the benefit of another corporation turns in large part upon the relationship of the corporations. In Oxford Dev. Corp. v. Commissioner, T.C. Memo. 1964-182, the Court held that a corporation paying the expenses of another could not deduct those expenses because they were the expenses of another corporation and not its own. However, in Coulter Elecs., Inc. v. Commissioner, T.C. Memo. 1990-186, affd. 943 F.2d 1318 (11th Cir. 1991), the Court allowed a parent to deduct the expenses of a subsidiary corporation. In Austin Co. v. Commissioner, 71 T.C. 955, 967 (1979), the Court stated: "Expenses incurred for the benefit of another taxpayer are clearly not deductible under section 162, * * * but if the taxpayer pays the expense of another for its own proximate and direct benefit, a deduction may be allowable."

Petitioner claims that amounts paid on behalf of Olympic were ordinary and necessary business deductions. Respondent argues that petitioner had no equity ownership in Olympic, and the only relationship between petitioner and Olympic was that stock in both companies was owned by Bone and Guerrero.

It appears that petitioner paid these expenses on behalf of Olympic in order to protect Bone and Guerrero's investment in Olympic. They were Olympic's sole shareholders, and any benefit from the payments would have inured to them, not to petitioner. Bone testified that he made regular trips to Washington State to motivate Olympic employees and "get things rolling". Bone stated that he had a substantial personal investment in Olympic and that the trips he took to Washington State helped him to protect his investment. Petitioner did not have an equity interest in Olympic, and the evidence does not establish that petitioner paid the expenses of Olympic to protect petitioner's business interests. Accordingly, respondent's determination regarding this adjustment is sustained.

6. Insurance Expenses

Respondent determined that petitioner did not fully substantiate its insurance expenses. At trial, petitioner did not address this issue in any detail. While Bone testified that petitioner was required by banking institutions to maintain insurance on the lives of the shareholders, no corroborating documentary or other evidence was offered on this point. Under these circumstances, petitioner has not shown that the insurance deduction was an ordinary and necessary business expense of petitioner. Accordingly, respondent's determination on this issue is sustained.

7. Repair Expenses

Respondent determined that petitioner made an adjusting entry in 1992 of $1,543 for repair costs for which no support was provided. Consequently, respondent disallowed this amount. Petitioner did not attempt to substantiate this amount and presented no evidence at trial. Accordingly, petitioner is not entitled to the $1,543 repair expenses disallowed by respondent.

Investment Tax Credit

Findings of Fact

During the period between 1984 and 1992, petitioner purchased numerous pieces of equipment on which it claimed the investment tax credit (ITC). During the period between 1984 and 1992, petitioner recaptured the ITC from the disposition of an automobile that was sold on September 30, 1985. Petitioner's tax returns for the 1984 through 1992 tax years, however, reflect the disposition of various pieces of equipment.

Discussion

A taxpayer who claims an ITC must maintain various records establishing certain important facts pertaining to each item of section 38 property for which an ITC has been claimed. Chief among these records are those required to keep track of specific details identifying ITC assets and their acquisition and disposal. These records are required not only to verify the amount of the credit taken but also to determine whether any ITC

property is disposed of prematurely, thereby triggering the recapture provisions.  Section 1.47-1(e)(1)(i), Income Tax Regs., requires that a taxpayer's records show:  (1) The date on which the section 38 property is disposed of or otherwise ceases to be section 38 property; (2) the estimated useful life of the section 38 property as determined by reference to section 1.46-3(e), Income Tax Regs.; (3) the month and taxable year that the section 38 property was placed in service; and (4) the basis of the section 38 property.

A taxpayer who fails to keep these records required for identification of ITC property becomes subject to a series of special rules.  Under these special rules, a taxpayer is treated as having disposed of, in the taxable year, any ITC property which he is unable to establish was still on hand at the end of that taxable year.  If that deemed disposition occurs within the recapture period of the estimated useful life of the property, recapture results.  If the taxpayer fails to establish when the ITC property being retired during the taxable year was actually placed in service, the taxpayer is treated as having placed it in service in the most recent prior year in which similar property was so placed in service.  This result shall govern unless and until the taxpayer can prove that the property placed in service in that most recent year is currently on hand.  In that event, the taxpayer will be treated as having placed the retired

property in service in the next most recent year.  See sec. 1.47-1(e)(1)(ii) and (iii), Income Tax Regs.

The regulations under section 47 raise rebuttable presumptions that the facts are adverse to the taxpayer who fails to maintain the required records.  These presumptions arise not only when the taxpayer fails to maintain records at all but where the records fail to establish the requisite facts.

Petitioner reported an ITC carryover of $64,291 for the 1992 taxable year.  The ITC carryover was generated in the 1984-86 taxable years.  Petitioner had substantial asset dispositions between 1984 and 1992 but, with the exception of one automobile sale in 1985, reported no ITC recapture.  During respondent's examination, petitioner did not present adequate records or schedules to support each of the assets sold and the basis of the assets remaining which relate to the unused ITC.  Because petitioner did not present adequate records or schedules to support the ITC carryover, respondent determined that no ITC was available for carryover to 1992 or later years.

In support of its ITC claim, petitioner produced copies of its 1984 through 1991 tax returns and a collection of schedules, photographs, and invoices.  Petitioner, however, made no attempt to explain the schedules and invoices except to ask one of its witnesses if "a lot of work" went into their preparation.  Respondent's agent testified that an audit of an ITC issue

involves reviewing invoices to document the acquisition of assets and the sale documents which relate to the assets acquired. The agent further testified that he was unable to reconcile the assets listed on the schedule with the assets listed on the returns. Likewise, we have examined the schedules but are unable to ascertain which assets have been sold. Petitioner's records are inadequate for purposes of the ITC, and accordingly we sustain respondent's determination that petitioner is not entitled to a $64,291 ITC carryover from its 1991 to its 1992 taxable year.

Jobs Credit

Findings of Fact

Petitioner claimed a jobs credit carryover in 1992 of $25,500. Respondent determined that the jobs credit carryover from 1991 to 1992 was $25,304 rather than $25,500.

Discussion

Petitioner claimed a jobs credit carryover in 1992 of $25,500. Respondent determined that jobs credits were previously used in the 1989, 1990, and 1991 taxable years, leaving only $25,304 available for 1992. Accordingly, respondent disallowed $196 of the jobs credit carryover claimed by petitioner in 1992. On brief, petitioner conceded this issue. Thus, respondent's determination on this issue is sustained.

Accuracy-Related Penalty

Respondent determined that petitioner is liable for an accuracy-related penalty for its 1992 and 1994 taxable years under section 6662(a). That section imposes a penalty in the amount of 20 percent of any portion of the underpayment attributable to negligence or disregard of rules or regulations. Negligence is the lack of due care or failure to do what a reasonable and ordinarily prudent person would do under the circumstances. See Neely v. Commissioner, 85 T.C. 934, 947 (1985). The negligence penalty will apply if, among other things, the taxpayer fails to maintain adequate books and records with regard to the items in question. See Crocker v. Commissioner, 92 T.C. 899, 917 (1989).

Respondent determined that petitioner was liable for the penalty on the entire underpayment in each of the years under consideration. Petitioner failed to address the accuracy-related penalty in its brief and presented no evidence at trial as to why its actions were reasonable. Accordingly, petitioner has failed to show that its actions were reasonable and not careless, and not made with intentional disregard of rules or regulations, and

is liable for the section 6662(a) penalty for the 1992 and 1994 tax years.

To reflect the foregoing and to account for concessions of the parties,

<u>Decision will be entered</u>

<u>under Rule 155.</u>